IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IRFAN KHAN                )   CASE NO:
                          )
    Plaintiff,            )   CIVIL ACTION
vs.                       )
                          )
UNITED STATES OF          )
AMERICA,                  )
                          )
    Defendant.            )
                          )

## COMPLAINT FOR DAMAGES PURSUANT TO
## THE FEDERAL TORT CLAIM ACT

COMES NOW the Plaintiff, IRFAN KHAN, hereby sues Defendant, UNITED STATES OF AMERICA, and alleges as follows:

1.    This is an action brought against the United States pursuant to the Federal Tort Claims Act (28 U.S.C. §2675, *et seq.*) and 28 U.S.C. §§1346(b). The acts and omissions alleged against the United States of America were performed by employees of the United States. To Plaintiffs' knowledge and belief, these employees were employees of the Federal Bureau of Investigation and/or Department of Justice and/or United States Attorneys' Office and/or Federal Detention Center.

2.    That at all times material to this action the Plaintiff, IRFAN KHAN, (herein after referred to as "PLAINTIFF") is a naturalized citizen of the United States and a resident of Florida with his principal residence in Miami, Miami-Dade County, Florida.

3.    The Federal Bureau of Investigation is the agency belonging to the United States Department of Justice that serve as both a federal criminal investigative body and an internal intelligence agency responsible for investigating crimes in the United States.

4.     Prior to the filing of this Complaint, the above-named Defendant has been served notice of this claim pursuant to 28 U.S.C. §2675 of the Federal Tort Claims Act. Copy of Form 95 putting the United States on notice of the claim is attached hereto as Exhibit "A". Defendant has not responded to the claim within the six month time period denoted by the Federal Tort Claims Act.

5.     Venue is proper in the Southern District of Florida under 28 U.S.C. §1391(a)(2) because it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

6.     All conditions precedent to the bringing and maintenance of this action have been satisfied, performed or waived, including compliance with the Notice requirements set forth by the Federal Tort Claims Act.

## GENERAL ALLEGATIONS

7.     Irfan Khan is an American citizen. Specifically, Irfan is a naturalized United States citizen, his wife, Shazia, is a naturalized citizen, and his two children, Sana and Rizwan, and are citizens by birth.

8.     Prior to these charges, Irfan did not have a criminal history. He lived a productive and law-abiding life since immigrating to the United States in 1994. He sought legal employment and always took the necessary steps to obtain same. Since 1994, Irfan worked as a taxi driver, service technician, real estate licensee, and operated a limousine business before obtaining a contractual position in the computer industry. Irfan wanted to provide for his family and live the American dream.

9. Irfan Khan is also a Muslim from Pakistan. The conduct the Government subjected Irfan to, as a result of his religion, national origin, and its overzealousness in its war on terror was and still is, by all standards horrendous.

10. On May 12, 2011, Irfan was charged with conspiracy to provide and providing material support to a conspiracy to murder, kidnap, or maim persons overseas, in violation of 18 U.S.C. § 2339A, and with conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. Specifically, the indictment alleged that Irfan was sending material support in the form of currency to the terrorist organization "Tehrik-e Taliban Pakistan" ("Pakistani Taliban").

11. The Government's indictment is unsupported by record citations.

12. Specifically, the charging document speaks of the Pakistani Taliban as being an extremely violent organization and mentions other unrelated atrocities the Pakistani Taliban allegedly committed in 2010. However, Irfan was in no way implicated in these atrocities. The Government did not even attempt to argue that Irfan was, in any way, involved in those attacks.

13. When addressing these allegations, the court previously said the following with respect to this proffer: "I really want to not go into a whole history of the Pakistani Taliban and who they are and what they're doing over there and what not. I want to confine it to what's charged against [Irfan]." U.S. v. Khan, No. MJ11-01087, [Ca. Tr. at 14]. (C.D. Cal. May 19, 2011).

14. Despite having what the Government described as "at least a thousand" recorded calls in its possession, , the Government did not allege a single incident of Irfan advocating violence in any of those calls. U.S. v. Khan, No. 11-20331-CR-AJ, [DE: 134:56] (S.D. Fla. July 19, 2011).

15. In fact, the Government affirmed that Irfan expressed extreme distress that innocent people were being killed in Pakistan.

16. Rather, the charges specifically made against Irfan were based on the following four "overt acts":

   (a) In or around April and May 2008, Irfan caused three transfers of $990, $980, and $980, respectfully, to be made via wire transfer to Pakistan.

   (b) On or about June 25, 2009, [Hafiz] Khan and Irfan participated in a conversation in which [Hafiz] Khan called for an attack on the Pakistani Assembly that would resemble the September 2008 suicide bombing of the Marriott hotel in Islamabad, Pakistan.

   (c) On or about July 10, 2009, Irfan caused $500 to be sent via wire transfer to Amina [Khan] in Pakistan.

   (d) On or about August 20, 2009, [Hafiz] Khan participated in a conversation with Irfan in which they discussed sending money to the 'Sharia people,' after which [Hafiz] Khan called for Pakistani government officials to be destroyed and eliminated by an explosion."

These "overt acts" are discussed individually, *infra*.

17. The 2008 Wire Transfers-

   (a) The Government first alleged that Irfan made three wire transfers in April and May 2008 to a Pakistani Taliban commander by the name of Akbar Hussain. The Government argued that Mr. Hussain was identified through a recorded telephone call and public source information as a Taliban Commander in Kabal, a village in Swat Valley, Pakistan. U.S. v. Khan, 11-20331-cr-Jordan, [DE: 124:19; DE: 132:8] (S.D. Fla. July 15, 2011).

   (b) As it came to be known, this money was sent to a different Akbar Hussain.

   (c) This Akbar Hussain is not a Taliban Commander in Kabal.

   (d) Rather, he is a retired professor from Government Jehanzeb College and Government College Matta, Swat Valley, Pakistan.

   (e) He is also Shazia Khan, Irfan's wife's uncle.

(f) Irfan sent this money to Akbar Hussain for Shazia's use as she was visiting Pakistan and staying at her uncle's home from April 5, 2008 to June 6, 2008, as indicated in her U.S. Passport.

(g) Moreover, Akbar Hussain is a very common name in that region.

(h) For example, Irfan has four relatives named Akbar Hussain, none of which are Pakistani Taliban commanders. Irfan also has other relatives with similar names including Akhtar Hussain and Iqbal Hussain.

(i) Absent malicious intent or negligence, the fact that Akbar Hussain is such a common name, Irfan had multiple relatives with that name, Irfan's wife was staying at the home of a relative with that name at the time of this wire transfer, and this Akbar Hussain's identification information listed as a recipient to this wire transfer on its receipts, clearly must have informed the Government that this Akbar Hussain is not the Taliban commander with the same name.

(j) Furthermore, Irfan was indicted for "conspiring to provide material support to a Foreign Terrorist Organization."

(k) Despite the fact that these transfers were not sent to the Pakistani Taliban, the Pakistani Taliban was not even a Foreign Terrorist Organization ("FTO") at the time of these wire transfers.

(l) Specifically, these funds were transferred in April and May 2008. However, the Pakistani Taliban was designated a FTO by the United States Department of State on September 1, 2010, or two years after Irfan transferred these nominal funds for his wife's use.

(m) Moreover, despite monitoring over 1,000 phone calls, the Government did not even allege a single incident of Irfan providing support to the Pakistani Taliban after its designation as a FTO.

(n) Finally, the manner in which Irfan sent this money is also telling. Here, Irfan wire transferred these three transactions using his real name and identification. He took no steps to conceal the source or recipients of these funds because, in his eyes, he was simply sending money to his wife in Pakistan through her uncle. Nothing more.

(o) Accordingly, absent malicious intent or negligence, there was no reason to subject Irfan to these heinous charges as there was no evidence to support the proposition that these nominal funds were wire transferred with the intention of financially supporting the Pakistani Taliban, which was not even designated an FTO at the time these transactions were made.

18. June 2009 Telephone Conversation.

(a) Here, the Government alleged that, on June 25, 2009, Hafiz Khan spoke with his son, Irfan, in a telephone conversation. During this conversation, the Government argued that Hafiz Khan, and not Irfan, "called for" an "attack on the Pakistani Assembly that would resemble the September 2008 suicide bombing of the Marriott hotel in Islamabad, Pakistan." Irfan did not respond. U.S. v. Khan, No. 11-20331-CR-AJ, [D.E.:132:23-24] (S.D. Fla. July 19, 2011).

(b) First, this conversation was in Urdu and Pashto, Hafiz Khan's native tongue and a neutral translator will no doubt dispute the "called for" language and deem this conversation rhetoric.

(c) Second, the Government did not even allege Irfan "called for" violence to occur. In fact, Irfan did not even respond or acknowledge his father's alleged statement and, therefore, could not have joined this alleged "call for" violence. U.S. v. Khan, No. 11-20331-CR-AJ, [DE:132:23-24] (S.D. Fla. July 19, 2011). Rather, it appears Irfan was charged for listening to his 80 year old father's rants.

(d) According to the Government, what Irfan did do here was continue on in that conversation to discuss several other violent incidents that had occurred in Pakistan and criticized the Pakistani government. U.S v. Khan, No. MJ11-01087 [DE:132:7] (C.D. May 19, 2011).

(e) But as the Court correctly noted in response to the Government's proffer of such comments, there is nothing illegal about criticizing a government. U.S. v. Khan, No. 11-20331-CR-AJ, [D.E. 132:38] (S.D. Fla. July 19, 2011)

(f) What is also telling here is, with respect to the Pakistani Taliban, case agent Michael Ferlazzo indicated that Irfan referred to the Pakistani Taliban as "them" and not "us". U.S. v. Khan, No. 11-20331-CR-AJ [DE: 132:29] (S.D. Fla. July 19, 2011).

(g) Accordingly, absent malicious intent or negligence, there was no reason to subject Irfan to these heinous charges as there was no corroborating evidence to support the Government's former interpretation of this conversation.

19. July 2009 $500 Wire Transfer to Sister

(a) In July 2009, Irfan was charged for wire transferring $500 to Amina Khan.

(b) Amina is Irfan's sister.

(c) The Government alleged that Amina is a Pakistani Taliban supporter.

(d)  As it came to be known, Irfan sent $500 to his sister via Western Union.

(e)  He made no effort to conceal the sender or recipient of this transaction to avoid suspicion. This is because, in Irfan's eyes, he was simply sending money to help his sister. Nothing more.

(f)  Irfan sent this money to his sister because she was in dire need of money for basic necessities as a result of the breakout of a civil war in Pakistan.

(g)  In 2009, Swat Valley, Pakistan became a battleground for militants of Pakistan's Taliban and the Pakistani government. In May 2009, the Pakistani government sent 30,000 troops and launched airstrikes by the Pakistani Air Force to retake the Valley.

(h)  At that time, Amina was a civilian living in Swat Valley. As a result of this civil war, Amina and her five children, along with the other residents of this province, were forced out of their homes as Swat Valley turned into a war zone. Amina spent the next three days walking across the dangerous mountains between Swat Valley and Peshawar with her five children. She did not have food, money, or shelter. At first, Irfan was not able to contact Amina. In fact, he was certain his sister was one of the hundreds of civilians killed by the airstrikes. When he finally was able to reach them, his sister asked him to immediately send her money for food and shelter. So, Irfan wire transferred his sister $500.

(i)  Here, Irfan was indicted for "conspiring to provide material support to a FTO."

(j)  Again, despite the fact that these transfers were not sent to the Pakistani Taliban, the Pakistani Taliban was not even designated as a FTO at the time these transfers occurred. Specifically, this wire transfer was made in July 2009. However, the Pakistani Taliban was designated a FTO by the United States Department of State on September 1, 2010, or one year after Irfan transferred this money to his sister.

(k)  Despite monitoring over 1,000 phone calls, the Government did not even allege a single incident of Irfan providing support to the Pakistani Taliban after its designation as a FTO.

(l)  Accordingly, absent malicious intent or negligence, there was no reason to subject Irfan to these heinous charges as there was no evidence to support the proposition that this nominal transfer was sent with the intention of financially supporting the Pakistani Taliban, which was not even designated an FTO at the time these transactions were made.

20. August 2009 Telephone Conversation

(a) In the second identified telephone conversation chosen out of "at least a thousand calls", Irfan was again charged for being a passive and silent participant in a conversation with his father.

(b) Here, Hafiz Khan allegedly asked Irfan when he would be sending money to the "Sharia people." U.S. v. Khan, No. 11-20331-CR-AJ [DE 132:8] (S.D. Fla. July, 2011).

(c) Again, this conversation was in Urdu and Pashto and a neutral translator will clearly dispute the intended meaning of "Sharia people" in this conversation.

(d) In cross examination, Agent Ferlazzo admitted that "Sharia people" is a very broad term. In fact, all Muslims can be considered "Sharia people." However, it was the Government here who interpreted "Sharia people" to mean the "Pakistani Taliban", without more in terms of context or reference. The Government did not even allege Irfan doing anything or sending any money in response to this conversation. U.S. v. Khan, No. 11-20331-CR-AJ [DE: 132:38] (S.D. Fla. July, 2011).

(e) The most damning allegation in this conversation is Irfan's use of expletive language in referring to the Pakistani government as: "These Mother------- are big pimps." [DE: 132:9]. But as the Court correctly noted in response to the Government's proffer of this comment, there is nothing illegal about criticizing a government. U.S. v. Khan, No. 11-20331-CR-AJ [DE: 132:9] [DE: 98.2] (S.D. Fla. July, 2011).

21. The indictment did not accuse Irfan of any overt acts occurring after 2009.

22. Significantly, despite having over 1,000 conversations in its possession, the indictment did not allege a single incident of Irfan personally calling for violence to occur or even allege any financial transactions made to a designated FTO. [DE: 103]. To the contrary, Agent Ferlazzo testified that Irfan disagreed with the violent tactics of the Pakistani Taliban and expressed extreme distress that "innocent people were being hurt." The Government's admission of Irfan's disapproval of the Pakistani Taliban is antithetical to the allegations that he had been providing material support to the Pakistani Taliban or that he directly supported any conspiracy "to murder, kidnap, and maim persons in a foreign country", as charged in Government's indictment. Clearly, statements that innocent people should not be hurt are

inconsistent with allegations that Irfan was a supporter of terrorism. U.S. v. Khan, 11-20331-cr-Jordan, [DE: 95:3] (S.D. Fla. July 15, 2011).

23. In reference to Irfan's allegations, the Courts have made the following statements:

"[T]he particular allegations in the indictment as to this Defendant are relatively few and they're relatively slight in terms of the actual conduct that's alleged"; ". . . the lack of meat as to this Defendant, at least in the indictment"; In response to the Governments argument that while perhaps not as significant and strong as the evidence against Hafiz Khan, the evidence against Irfan was "compelling", the Court indicated that "'Compelling' is too strong a word, at this stage, based on what I've seen."; "[G]ive me something that relates to [Irfan] and that perhaps [Irfan] said and not that somebody else said about him";; "In this context Shariah means blah, blah, blah', that's your interpretation, right?"; "[D]iscussing incidents is very different than embracing them. And the sins of the father can't always be visited on the son." [D.E. 124:16]. U.S. v. Khan, No. MJ11-01087, [Cal. Tr. At 50-51] [D.E. 124:15] [D.E. 124:15] [Ca. Tr. At 12] [Ca. Tr. At 13] (C.D. Cal. May 19, 2011).

24. Despite its lack of evidence, the Government indicted Irfan with heinous charges in a failed effort that demonstrates its overzealousness in its war on terror. As a result of this crusade, the Government destroyed an innocent man. On May 14, 2011, Irfan was arrested in California, where he was working as a software consultant for International Rectifier, and placed in the Special Housing Unit (a/k/a "Solitary Confinement" or "SHU).

25. On June 7, 2011, Irfan was transferred to Miami where he remained in SHU throughout the duration of his false imprisonment and until his eventual release on bond on March 28, 2012.

26. On June 13, 2012, the Government dropped all charges against Irfan Khan.

27. In whole, Irfan served 319 days, or 10.5 months, in solitary confinement for a crime he did not commit.

28. The physical, emotional, and psychological pain Irfan and his family were unnecessarily made to endure as a result of this witch hunt is unconscionable.

29. Irfan's name was smeared throughout the world and Defendant portrayed Irfan as guilty before dropping all charges against this innocent man.

30. In its press release dated May 14, 2011, the Department of Justice, through Wilfredo Ferrer, U.S. Attorney for the Southern District of Florida, and John Gillies, former Special Agent in Charge, FBI Miami Field Office, indicated that Irfan was charged with "conspiracy to murder, maim and kidnap persons, overseas."

31. This is in direct contradiction to Agent Ferlazzo's admission in open court that Irfan expressed extreme distress that innocent people were being killed in Pakistan; statements based on evidence the Government was in possession of at the time of this press release.

32. Mr. Ferrer continued on in this crusade and argued that: "[b]ut for law enforcement intervention, [Irfan] would have continued to transfer funds to Pakistan to finance the Pakistani Taliban, including its purchase of guns."

33. Again, this statement was made in direct contradiction to later-presented evidence that was in the FBI's possession at the time of this press release.

34. Mr. Ferrer ended his statement by proclaiming that: "[d]ismantling terrorist networks is a top priority for this office and the Department of Justice." Mr. Gillies argued that "[t]oday, terrorists have lost another funding source to use against innocent people and U.S. interests. We will not allow this country to be used as a base for funding and recruiting terrorists." Despite having access to all evidence used in support of charging Irfan, the Government decided to move forward in their crusade against Irfan. In the process, they destroyed an innocent man.

35. Defendants' misconduct resulted in Plaintiff suffering severe emotional pain and suffering.

36. In this matter, the Government inappropriately charged and imprisoned an innocent man for heinous crimes. While accusing Irfan of supporting a violent, international terrorist organization willing to maim and kill, the government did not acknowledge Irfan's expressed distress and disapproval of the fact that innocent people were being hurt. This evidence not only refuted the government's allegations of dangerousness, it was a significant mitigating fact that ultimately made it impossible for the government to prove Irfan knowingly and intentionally supported terrorist. U.S. v. Khan, 11-20331-cr-Jordan, [DE: 132:56]. (S.D. Fla. July 15, 2011).

37. The harm the Government caused Irfan is extraordinary. Irfan's unlawful arrest and imprisonment caused him to suffer and endure 319 days of the worst conditions imaginable; forced him to suffer illegal and intrusive searches and seizures; caused him to be separate from his family and young children; took away his personal right to privacy; caused him to endure, as he continues to endure, extreme mental anguish and humiliation, embarrassment, damage to his general reputation, and permanent impairment to his earning capacity.

## COUNT I
## FALSE ARREST/ FALSE IMPRISONMENT AGAINST DEFENDANT, UNITED STATES OF AMERICA

38. Plaintiff adopts and re-alleges paragraphs 1 through 38 as fully set forth herein and further alleges as follows:

39. Plaintiff brings this claim against the Defendant, UNITED STATES OF AMERICA for false arrest, and false imprisonment to Plaintiff, IRFAN KHAN.

40. All conditions precedent to the bringing and maintenance of this action have been satisfied, performed or waived, including compliance with the Notice requirements set forth by the Federal Tort Claims Act.

41.     At all times material hereto, Defendant, UNITED STATES OF AMERICA, and its employees and agents had a duty to use reasonable care in the performance of law enforcement activities so as not to endanger the liberty of persons within any foreseeable zones of risk created by such activities, including Plaintiff, IRFAN KHAN.  Defendant also had a duty to refrain from falsely arresting Plaintiff and falsely imprisoning Plaintiff.

42.     All acts and omissions of Defendant's, UNITED STATES OF AMERICA, employees and agents alleged herein were performed within the course and scope of their employment and/or agency with the Defendant, UNITED STATES OF AMERICA.

43.     Defendant, UNITED STATES OF AMERICA, through its agents, arrested and imprisoned Plaintiff, IRFAN KHAN when in truth and in fact he had committed no crime.  The arrest and subsequent detention of his person lacked probable cause.

44.     As a direct and proximate result of the negligent acts and omissions of Defendant, UNITED STATES OF AMERICA, and its employees and agents, Plaintiff, IRFAN KHAN was falsely arrested, jailed, and suffered mental anguish.

45.     As a direct and proximate result of the negligence of Defendant, UNITED STATES OF AMERICA, as described above, Plaintiff, IRFAN KHAN, was arrested and detained for a crime he did not commit, causing the Plaintiff to suffer mental anguish, loss of capacity for the enjoyment of life, medical treatment, loss of earnings, loss of ability to earn money, all of which losses will be permanent and continuing, and the Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff, demands judgment against the Defendant, UNITED STATES OF AMERICA, for compensatory damages, punitive damages, attorneys' fees, costs and interest and further prays for such other relief as the Court may deem just and appropriate.

## COUNT II
## MALICIOUS PROSECUTION AGAINST DEFENDANT
## UNITED STATES OF AMERICA

46. Plaintiff adopts and re-alleges paragraphs 1 through 37 as fully set forth herein and further alleges as follows:

47. Plaintiff brings this claim against the Defendant, UNITED STATES OF AMERICA for malicious prosecution to Plaintiff, IRFAN KHAN.

48. All conditions precedent to the bringing and maintenance of this action have been satisfied, performed or waived, including compliance with the Notice requirements set forth by the Federal Tort Claims Act.

49. At all times material hereto, Defendant, UNITED STATES OF AMERICA, initiated a criminal action against Plaintiff which lacked probable cause and was undertaken with malice. The action resulted in a bona fide termination in Plaintiff's favor.

50. All acts and omissions of Defendant's, UNITED STATES OF AMERICA, employees and agents alleged herein were performed within the course and scope of their employment and/or agency with the Defendant, UNITED STATES OF AMERICA.

51. As a direct and proximate result of the acts and omissions of Defendant, UNITED STATES OF AMERICA, and its employees and agents, Plaintiff, IRFAN KHAN was falsely arrested, jailed, had to undergo pre-trial confinement, and suffered mental anguish.

52. As a direct and proximate result of the acts of Defendant, UNITED STATES OF AMERICA, as described above, Plaintiff, IRFAN KHAN, was prosecuted for a crime he did not commit, causing the Plaintiff to suffer mental anguish, loss of capacity for the enjoyment of life, medical treatment, loss of earnings, loss of ability to earn money, all of which losses will be permanent and continuing, and the Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff, demands judgment against the Defendant, UNITED STATES OF AMERICA, for compensatory damages, punitive damages, attorneys' fees, costs and interest and further prays for such other relief as the Court may deem just and appropriate.

Jury Trial Demanded and Advisory Jury Requested.

Respectfully submitted this 3rd day of December, 2013.

                                         Michael N. Hanna, Esquire
                                         FL Bar No.: 85035
                                         MORGAN & MORGAN, P.A.
                                         600 N. Pine Island Road
                                         Plantation, FL 33324
                                         Tel: 954-318-0268
                                         Fax: 954-424-8317
                                         E-mail: Mhanna@forthepeople.com

                                         *Trial Counsel for Plaintiffs*