# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 13-24366-CIV-ALTONAGA/Damian

IRFAN KHAN,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court on Defendant, the United States of America's (the "Government['s]") Motion for Summary Judgment [ECF No. 287]; and Plaintiff, Irfan Khan's Motion for Summary Judgment [ECF No. 295]. Plaintiff and the Government filed their respective Responses (*see* [ECF Nos. 298, 301]), followed by Reply memoranda (*see* [ECF Nos. 305, 307]). The Court has carefully considered the record, the parties' written submissions,[1] and applicable law. For the following reasons, the Motions are denied.

## I. BACKGROUND

This matter arises out of the arrest and detention of Plaintiff, a United States citizen who has worked in this country since his arrival and maintained a clean criminal record (*see* Am. Compl. [ECF No. 39] ¶ 8); that is, until he was charged by a grand jury with conspiring to provide and providing material support to a conspiracy to murder, kidnap, or maim persons overseas, as

---

[1] The parties' factual submissions include the Government's Statement of Undisputed Material Facts ("Gov't's SOF") [ECF No. 288]; Plaintiff's Statement of Undisputed Material Facts ("Pl.'s SOF") [ECF No. 296]; the Government's Response to Plaintiff's Statement of Facts ("Gov't's Resp. SOF") [ECF No. 299]; Plaintiff's Response to the Government's Statement of Facts ("Pl.'s Resp. SOF") [ECF No. 301]; the Government's Reply Statement of Material Facts ("Gov't's Reply SOF") [ECF No. 306]; and Plaintiff's Reply to the Government's Response to Plaintiff's Statement of Facts ("Pl.'s Reply SOF") [ECF No. 308].

well as conspiring to provide material support to the Pakistani Taliban, a Foreign Terrorist Organization ("FTO") (*see generally* Pl.'s Not. of Filing Exs., Ex. 1, Indictment [ECF No. 297-1]).

In support of the conspiracy charge, the Indictment listed four overt acts in which Plaintiff allegedly participated: (1) three transfers of money made via wire transfer to Akbar Hussain ("Akbar") in April and May 2008; (2) participation in a conversation with Plaintiff's father, Hafiz Khan ("Hafiz") in June 2009, during which Hafiz called for a terrorist attack; (3) another wire transfer to Plaintiff's sister, Amina Khan ("Amina"), who the Government alleged was collecting money for the Pakistani Taliban; and (4) participation in another conversation with Hafiz, during which the two discussed sending money to the "Sharia people," after which Hafiz called for another attack. (*See id.* 4, 7–8. The Indictment did not describe any overt acts by Plaintiff after 2009 or list any incident in which Plaintiff personally called for violence. (*See generally id.*).

At the grand jury proceedings, Special Agent ("SA") Andrew Janssen, an agent with the Federal Bureau of Investigation ("FBI"), testified to the actions of Hafiz and his alleged co-conspirators, including Plaintiff. (*See generally* Pl.'s Not. of Filing Exs., Ex. 3, Test. of Andrew Janssen [ECF No. 297-3] ("Janssen Test.")).[2] SA Janssen testified the Indictment was "correct to the best of [his] knowledge, with respect to this investigation[,]" although he also indicated his testimony did not cover "every single fact known to [him] and others regarding this matter[.]" (*Id.* 84:7–10 (alterations added)).[3] When asked about a transcript of a call between Hafiz and Plaintiff,

---

[2] The parties disagree on how to interpret even relatively straightforward statements in the record. (*Compare, e.g.*, Pl.'s SOF ¶¶ 13–30, *with* Gov't's Resp. SOF ¶¶ 13–30). Having reviewed a transcript of SA Janssen's testimony, the Court recounts the portions it concludes are about Plaintiff.

[3] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings. Citations to deposition testimony and transcripts rely on the pagination and line numbering in the original document.

SA Janssen stated the two "discuss[ed] the need to repeat a violent incident" similar to a previous suicide bombing, this time directed at the Pakistani government. (*Id.* 38:5–39:12 (alteration added)). He also agreed this conversation was one of the overt acts described in the Indictment. (*See id.* 40:7–11; *see also* Indictment 7).

Similarly, SA Janssen testified Plaintiff "state[d] that he would like to send money to the Sharia people, but he doesn't currently have money." (Janssen Test. 50:18–20 (alteration added)). He agreed this conversation was also an overt act. (*See id.* 50:21–23; Indictment 8). In discussing the transfer of funds for the Pakistani Taliban, SA Janssen included Plaintiff's $500 payment to Amina (*see* Janssen Test. 50:24–53:14), which he again indicated was an overt act (*see id.* 54:16–19; *see also* Indictment 7). SA Janssen testified the "reason" for this payment was "to avoid suspicion or scrutiny." (Janssen Test. 54:20–24).

In discussing another of the alleged overt acts, SA Janssen highlighted Plaintiff's transfers of $990, $980, and $980 "[t]o Akbar Hussain." (*Id.* 79:6–16 (alteration added); *see also* Indictment 7). SA Janssen did not elaborate on Akbar Hussain's specific identity. (*See generally* Janssen Test.).

In his testimony, SA Janssen sometimes referred generally to "others" or "co-defendants." (*See, e.g.*, Gov't's Resp. SOF ¶¶ 13–30). Some of these statements implicated Plaintiff. (*See, e.g.*, Pl.'s Reply SOF ¶¶ 13–30). For example, after discussing the money Hafiz "and others ha[d] sent," SA Janssen agreed "some" of this money was "for the purchase of guns for the Taliban[.]" (Janssen Test. 62:4–7 (alterations added)). Shortly before this, SA Janssen testified at length about Plaintiff's transfer of funds to Amina, which the Indictment alleged was ultimately for the Pakistani Taliban. (*See id.* 50:24–53:14).

SA Janssen confirmed Hafiz "and the other co-defendants [we]re generally supportive" of violence inflicted by the Pakistani Taliban (*id.* 68:20–23 (alteration added)), and that neither Khan nor "any of the co-defendants ever waiver[ed] [sic] from their ultimate goal of the Pakistan Taliban implementing Sharia" (*id.* 69:5–8 (alteration added)).   SA Janssen agreed "that Hafiz Khan and the others provided other support" to the group as well.   (*Id.* 72:3–6).  This was in line with the Indictment's allegations that Plaintiff "knowingly and willingly" conspired to provide material support to the Pakistani Taliban.  (Indictment 5, 10–11).

The grand jury indicted Plaintiff on May 12, 2011.  (*See id.* 1).  On May 14, 2011, while working as a software consultant in California, Plaintiff was arrested and placed in solitary confinement.  (*See* Am. Compl. ¶ 24).  On June 7, 2011, he was transferred to Miami and held in solitary confinement until he was released on bond on March 28, 2012.  (*See id.* ¶ 26).  Plaintiff spent a total of 319 days in solitary confinement.  (*See id.* ¶ 28).

At a detention hearing, another FBI special agent — SA Michael Ferlazzo — largely reiterated the Government's case as presented to the grand jury.  (*See* Pl.'s SOF ¶¶ 125–69; Gov't's Resp. SOF ¶¶ 125–69).  This time, however, SA Ferlazzo also testified that Akbar was "a Taliban Commander[.]"  (Pl.'s SOF ¶ 130 (alteration added); *see also* Gov't's Resp. SOF ¶ 130).  By court order, Plaintiff's detention was continued.  (*See* Pl.'s SOF ¶ 127; Gov't's Resp. SOF ¶ 127 (disputing characterization of detention order but not detention)).  Shortly after, on June 13, 2012, the Government dropped all charges against Plaintiff.  (*See* Am. Compl. ¶ 27)

On December 3, 2013, Plaintiff filed a Complaint [ECF No. 1] against the Government, asserting two claims for relief: false arrest and false imprisonment (Count I) and malicious prosecution (Count II).  (*See generally id.*).  The Government filed a Motion to Dismiss or for Summary Judgment [ECF No. 22]; on April 27, 2014, the undersigned granted the Motion to

Dismiss (*see generally* Apr. 27, 2014 Order [ECF No. 37]).  On May 7, 2014, Plaintiff filed an Amended Complaint (*see generally* Am. Compl.), asserting the same claims, to which the Government filed another Motion to Dismiss [ECF No. 48].  On July 7, 2014, the undersigned dismissed the false arrest and false imprisonment claim, leaving only the malicious prosecution claim.  (*See* July 7, 2014 Order [ECF No. 73] 10).

After a lengthy stay to allow the parties to complete discovery, the Court reopened the case, and the parties moved for summary judgment.  (*See generally* Joint. Mot. to Reopen Case and For Entry of New Trial Schedule ("Mot. Reopen") [ECF No. 255]; Pl.'s Mot.; Gov't Mot).  In their Motions for Summary Judgment, both parties insist no genuine disputes of material fact remain for the Court's consideration.  (*See generally* Pl.'s Mot.; Gov't Mot.).  According to Plaintiff, the Government knew he disapproved of the Pakistani Taliban and expressed distress for those hurt by its tactics, as well as distaste for the idea that Islam could be "established by force."  (Pl.'s SOF ¶ 21 (emphasis omitted); *see also* Am. Compl. ¶ 22).  Further, Plaintiff asserts the Government knew and ignored important contextual information for his actions — for example, Akbar, despite having a similar name to a Pakistani Taliban leader, was Plaintiff's relative (*see* Pl.'s SOF ¶ 38 n.2); Amina was a displaced war refugee in need of support (*see id.* ¶¶ 76–79, 137); and "Sharia people" was a phrase susceptible to more innocuous translation (*see id.* ¶¶ 100, 140).

According to the Government, there was evidence to support its belief that Akbar was a Pakistani Taliban commander (*see* Gov't Resp. SOF ¶ 131); Amina was in fact safe and not in need of financial support (*see* Gov't Reply SOF ¶ 55); and "Sharia people" in this context was reasonably understood to be a reference to the Pakistani Taliban (*see id.* ¶¶ 94–99).  As evidence of Plaintiff's guilt, the Government also points to Plaintiff's apparently well-founded concerns that he and his family were being surveilled.  (*See* Gov't SOF ¶¶ 37, 115).  Based on this evidence

and other evidence in the record, the Government argues it had probable cause to prosecute Plaintiff, and Plaintiff thus cannot prove the elements of his claim.  (*See* Gov't's Mot. 27–28). Further, the Government argues, the SAs that Plaintiff accuses of wrongdoing were not the legal cause of his prosecution, which was controlled by federal prosecutors.  (*See id.* 28–31).

## II.  LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought."  Fed. R. Civ. P. 56(a). Summary judgment may be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law.  *See id.* 56(a), (c).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court draws all reasonable inferences in favor of the party opposing summary judgment.  *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).

If the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by: (1) establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim and (2) showing the court there is insufficient evidence to support the non-moving party's case.  *See Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-Civ-14209, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015).  "Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute."  *Id.* (alteration added; quotation marks omitted; quoting Fed. R.

Civ. P. 56(c)(1)).  In considering cross-motions for summary judgment, the court views the facts in the light most favorable to the non-moving party on each motion.  *See Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012) (citations omitted).

### III.  DISCUSSION

The Court begins with threshold issues raised by the parties.  It then turns to whether either party is entitled to summary judgment on Plaintiff's malicious prosecution claim, concluding neither party is, as genuine disputes of material fact remain.

### A.  Preliminary Issues

Before the Court considers the merits of the parties' Motions, it addresses several threshold arguments, if only to point out that they are not well-taken.  The parties, after eight years of discovery, represented to the Court that "matters requiring delay are resolved," and they "have completed discovery[.]"  (Mot. Reopen 2 (alteration added)).  Yet, the parties continue to quarrel about how discovery was handled and, further, insist the Court must strike or otherwise refuse to consider portions of the record proffered by the other.  (*See, e.g.*, Pl.'s Reply SOF 1–8, 10–12; Gov't's Resp. 4–5 n.4).

The undersigned has already declined to consider these issues on several occasions when these were raised in other motions,[4] but similar arguments are woven throughout the parties' briefing.  These arguments fall roughly into four categories: (1) arguments about the Government's

---

[4] On October 18, 2023, Plaintiff filed a Motion to Preclude [ECF No. 300], which the Court denied, indicating that objections "should be addressed" via the parties' summary judgment briefing (*see* Oct. 19, 2023 Order [ECF No. 304]).  In his Reply, Plaintiff raises several objections to the Government's handling of disclosures and evidence.  (*See* Pl.'s Reply 1–12).  On November 2, 2023, the Government filed its own Motion to Strike [ECF No. 309], which the Court also denied (*see* Nov. 2 Order [ECF No. 310]).  Then, on December 20, 2023, the Government filed a self-styled Motion for Relief Under FRCP 37 [ECF No. 311], which the Court again denied, cautioning the Government that the Motion contravened the Court's clearly communicated prohibition on motions *in limine* (*see* Dec. 20, 2023 Order [ECF No. 312]; Sept. 27, 2023 Scheduling Order [ECF No. 286] 1).

CASE NO. 13-24366-CIV-ALTONAGA/Damian

invocations of privileges; (2) arguments about experts; (3) arguments about relevance; and (4) arguments about spoliation.   None of these arguments is appropriately raised on summary judgment.  The Court explains.

First, Plaintiff argues the Government should be precluded from relying on certain evidence cited in its Response to Plaintiff's Statement of Material Facts.  (*See* Pl.'s Reply SOF 1–8, 10–12).  According to Plaintiff, that evidence is part of a larger body of evidence, much of which remains undisclosed, and Plaintiff is concerned the undisclosed evidence might provide additional, exculpatory context.  (*See id.*).  This argument is premature.  Plaintiff concedes the Government produced "the specific calls" it relied on and does not identify what evidentiary rules preclude the Court from considering the evidence.  (*Id.* 3).  Instead, he argues the Court should sanction the Government for not producing "critical contextual evidence" for those calls.  (*Id.* 3–4).  But Plaintiff does not describe what this alleged "critical contextual evidence" is (*see generally id.*), and at this juncture, the existence of any such evidence is wholly speculative.[5]

Second, both parties challenge the other's reliance on statements by special agents: Plaintiff asks the Court to disregard a declaration by SA Janssen (*see id.* 8–10); the Government seeks to exclude the deposition testimony of SA Anthony D'Angelo, who offered his opinion on "the truthfulness of testimony provided to the grand jury and the sufficiency of the [G]overnment's evidence" (Gov't's Resp. 4–5 n.4 (alteration added)).  These arguments are premature as well.

Starting with the Government's argument, asking "the Court to simply disregard [expert] testimony [is] the functional equivalent of a *Daubert* motion."  *Landivar v. Celebrity Cruises, Inc.*, 584 F. Supp. 3d 1150, 1158 (S.D. Fla. 2022) (alterations added).  While *Daubert* motions are part

---

[5] To the extent Plaintiff seeks any further disclosure of information, these arguments are misdirected.  The parties can return to the Magistrate Judge and seek additional resolution of any discovery disputes, but if they choose to do so, the undersigned will remove the case from the trial calendar.

of the Court's evidentiary "gatekeeping duties," "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for herself." *Id.* (alteration adopted; other alteration added; quotation marks and citation omitted).  Thus, the Court can — and has — declined to consider such motions before trial.  (*See* Sept. 27, 2023 Scheduling Order 1).  After all, on summary judgment, the Court does not weigh evidence or determine credibility.  *See Landivar*, 584 F. Supp. 3d at 1158 (citing *Buending v. Town of Redington Beach*, 10 F.4th 1125, 1130 (11th Cir. 2021)).  Arguments regarding the qualifications and credibility of expert witnesses are best addressed at trial, where the Government "remains free" to advance arguments in the form of cross-examination or additional evidence.  *Id.* at 1159.

For the same reason, the Court declines to wholesale disregard any arguably "inconsistent" testimony in SA Janssen's declaration.  (*See* Pl.'s Reply SOF 8).  As with SA D'Angelo, Plaintiff may cross examine SA Janssen and assert credibility arguments at trial.

Third, Plaintiff lodges several relevance objections to evidence the Government relies on — including objections to evidence about individuals other than Plaintiff, and information arising from other points of the Government's investigation.  (*See* Pl.'s Reply SOF 4–8).  But it would be inappropriate to wholesale exclude evidence based on these broad relevance arguments.  After all, Plaintiff was investigated for and charged with conspiracy.  (*See generally* Indictment).  It is not *per se* irrelevant for the Government to offer information about other members in the conspiracy or present evidence arising from other points in its investigation.

Fourth, and finally, Plaintiff seeks default judgment as a sanction for the FBI's alleged spoliation of evidence.  (*See* Pl.'s Mot. 28–29).  But the parties offer conflicting factual assertions about whether evidence was spoliated — including whether any of the destroyed evidence was relevant, and whether Plaintiff can still access that evidence — rendering the issue inappropriate

for resolution on summary judgment motions. (*See* Gov't's Resp. 25–26 (questioning the existence of relevant evidence and stating evidence was returned to Plaintiff before destruction); Pl.'s Reply 21 (stating the evidence was potentially relevant but returned on an "inoperable" device)).

### B. Malicious Prosecution

With this, the Court turns to an examination of three of the six elements of a malicious prosecution claim and whether material facts are in dispute. To prevail on his claim, Plaintiff must prove: (1) a judicial proceeding existed against Plaintiff; (2) the Government was the "legal cause" of that proceeding; (3) the proceeding ended with a "bona fide termination" in Plaintiff's favor; (4) no probable cause existed for the proceeding; (5) the Government acted with malice; and (5) Plaintiff was damaged by the proceeding. *Debrincat v. Fischer*, 217 So. 3d 68, 70 (Fla. 2017) (citation omitted). At issue in the parties' briefing are legal causation, the absence of probable cause, and malice.[6] The Court considers each disputed element in turn.

---

[6] The parties raise two additional arguments that were previously resolved, and hence, not addressed in this Order. First, the Government disputes that there was a bona fide termination in Plaintiff's favor. (*See* Gov't's Resp. 3–4). For the reasons stated in its prior Order, the Court continues to "agree with [Plaintiff] that there was a bona fide termination of the underlying action in his favor." (Apr. 28, 2014 Order 10 (alteration added)). Second, there is no merit to Plaintiff's argument that "SA Janssen falsely advised the [grand jury] that the facts set forth in the indictment [we]re correct and consistent with the FBI's investigative findings . . . thereby affirmatively misleading the [grand jury] to believe that the FBI obtained evidence concerning [Plaintiff] supporting a designated FTO." (Pl.'s Mot. 18 (alterations added; citation omitted)). Plaintiff emphasizes that the Pakistani Taliban was designated an FTO after the overt acts he is alleged to have committed. (*See id.*). But, as the Government notes (*see* Gov't's Resp. 20 n.15), a court previously concluded the Indictment sufficiently alleged Plaintiff's support of an FTO because other members of the conspiracy supported the Pakistani Taliban after its FTO designation. (*See United States v. Khan*, No. 11-cr-20331, Order Denying Defendant's Motion to Dismiss Count Two of the Superseding Indictment [ECF No. 267] filed January 12, 2012, at 5 n.1 (S.D. Fla. 2014)). Plaintiff provides no reason for the Court to revisit this well-reasoned conclusion. (*See* Pl.'s Mot. 18–19; Pl.'s Reply 18 n.35). Nor does Plaintiff explain how, given that the Indictment was sufficient on this point, it was misleading for SA Janssen to affirm its accuracy as a general matter. (*See* Pl.'s Mot. 18 (citing Pl.'s SOF ¶ 26)).

CASE NO. 13-24366-CIV-ALTONAGA/Damian

### 1. *Legal causation*

First, the parties dispute whether Plaintiff can show legal causation.[7]  Specifically, Plaintiff asserts the SAs and FBI were the legal cause of the proceeding against him because they made "material misrepresentations" when seeking his Indictment and detention, and "also failed to investigate and otherwise ignored evidence" that could have halted the proceeding.  (Pl.'s Mot. 2–3).  The Government emphasizes the final decision-making authority of the federal prosecutors who received information from the SAs.  (*See* Gov't's Mot. 28–31).

The test for legal causation looks to "whether the defendant's action was the proximate and efficient cause of putting the law in motion.  Although one may not have intended to institute a criminal proceeding, he may be liable if he afterward continued the prosecution or gave it momentum."  *Harris v. Lewis State Bank*, 482 So. 2d 1378, 1381 (Fla. 1st DCA 1986) (footnote call numbers and citations omitted).  As Plaintiff notes (*see* Pl.'s Resp. 29–30), law enforcement officers are not immune from liability merely because they are "'not the prosecutor[s] of record.'"  *Ware v. United States*, 971 F. Supp. 1442, 1462 (M.D. Fla. 1997) (alteration added; quoting *Harris*, 482 So. 2d at 1381).  Rather, determining whether an officer was the "legal cause" of a proceeding is a case-specific inquiry that considers whether the officer "played a key role" or took "active part in the proceedings[.]"  *Id.* at 1461–62 (alteration added; citation and quotation marks omitted).

In this case, a genuine dispute of material fact remains as to whether the SAs legally caused Plaintiff's prosecution.  *Cf. Alterra Healthcare Corp. v. Campbell*, 78 So. 3d 595, 603 (Fla. 2d DCA 2011) (describing legal causation as "a jury issue" (citation omitted)).  As the Government notes, the federal prosecutor in the underlying case filed a declaration indicating that "none of the

---

[7] The Government notes that legal causation also implicates its entitlement to sovereign immunity.  (*See* Gov't's Mot. 31).  Because these arguments rise and fall together, the Court does not separately consider the issue of immunity and turns directly to causation.

Special Agents who investigated Plaintiff participated in the decisions to charge him or to continue the prosecution following his indictment, nor did any of the Special Agents improperly influence those decisions." (Gov't Mot. 28–29 (citation omitted)). But it is not dispositive that a prosecutor "ultimately controlled the trial and prosecution of [Plaintiff] on behalf of the Government." *Ware*, 971 F. Supp. at 1462 (citation omitted). Officers can still be the legal cause of proceedings when they have an "active, pivotal role in both the investigation and prosecution[.]" *Id.* at 1461 (alteration added). Signs of such a role include "produc[ing] and gather[ing] the Government's evidence[.]" *Id.* (alterations added).

Plaintiff objects to the Government's arguments on this point, emphasizing the Government refuses to disclose information about its trial strategy in the underlying criminal case. (*See* Pl.'s Reply SOF 10–12). As explained, the Court will not address these arguments on motions for summary judgment preceding a bench trial. But even without additional disclosure from the Government, there is evidence suggesting the SAs here were the legal cause of Plaintiff's prosecution. SA Janssen testified before the grand jury that he "manage[d] and overs[aw] everything that happen[ed] in the investigation." (Janssen Test. 3:9–10 (alterations added)). Further, testimony from another SA suggests SAs Janssen and Ferlazzo were, along with the prosecutors, part of "the decision to move forward with prosecution[.]" (Pl.'s Resp. 29 (alteration added; quoting Pl.'s Not. of Filing Exs., Ex. 5, Janet Waldron Dep. Tr. [ECF No. 297-5] 243:11–17)).

At bottom, the Government cannot dispute the SAs played a role in the proceeding. Determining the nature and extent of that role raises a genuine dispute of material fact best left for trial and not appropriate for decision here.

2.  *Probable cause*

Next, the parties dispute whether probable cause existed for the proceeding against Plaintiff.  (*See, e.g.*, Pl.'s Mot. 5–23; Gov't Resp. 4–19).  The Court first addresses two threshold questions before considering the issue of probable cause in light of Plaintiff's two theories: malicious commencement and malicious continuation.  Ultimately, genuine disputes of material fact remain as to whether probable cause existed.

a.  *Threshold questions*

To begin, the Court considers two issues that direct the nature of its inquiry and the scope of its consideration.  First, must Plaintiff show that probable cause was lacking at every stage of the relevant proceeding?  Second, may the Government establish probable cause using information not presented to the grand jury?

i.  *Commencement vs. continuation*

The Government first argues that Plaintiff must show an absence of probable cause at every stage of the proceeding and "not merely upon its commencement."  (Gov't Resp. 23 (citations omitted)).  Thus, the Government seems to argue it can prevail on the basis of probable cause as it existed *before* it ever sought the Indictment.  (*See* Gov't Mot. 13–28; Gov't Resp. 21–23 (arguing that actions at a bond hearing after the Indictment "are irrelevant to [Plaintiff's] claim" (alteration added)).

The cases cited by the Government in support of its position deal with a different issue entirely: malicious *continuation* of prosecution.  (*See* Gov't Resp. 23 (citing *Ware*, 971 F. Supp. 1442; *Endacott v. Int'l Hosp., Inc.*, 910 So. 2d 915 (Fla. 3d DCA 2005)).  Malicious continuation is a type of malicious prosecution and not a necessary element of the claim; plaintiffs must show *either* "the commencement *or* continua[tion]" of a proceeding.  *Endacott*, 910 So. 2d at 920

(alteration and emphasis added; citations omitted).   Commencement refers to the start of proceedings; continuation refers to events *after* the indictment.   *See Ware*, 971 F. Supp. at 1462 (describing the "stages of the prosecution" as "indictment to acquittal").   Consequently, the Government's cited cases stand only for the proposition that *if* plaintiffs seek to show malicious continuation, they must show "that probable cause . . . [was] lacking at all stages of the prosecution[.]"   *Id.* (alterations added).

Unfortunately, Plaintiff's characterization of his claim muddies the waters.   In his Amended Complaint, Plaintiff focuses on the "initiat[ion]" of "criminal action against Plaintiff[.]" (Am. Compl. ¶ 49 (alterations added)).   He makes no mention of continued prosecution.   (*See generally id.*).   He does, however, allege the omission of important information in hearings after the Indictment.   (*See id.* ¶ 36).

Similarly, in his briefing, Plaintiff insists "the Court need not analyze [his] continued detention after the [I]ndictment" and suggests he only briefs the matter to "provide a complete analysis" of the Government's wrongdoing.   (Pl.'s Mot. 19 (alteration added); *see also id.* 21 (stating "the Court can end its analysis" with the Indictment)).   Ultimately, he argues "material misrepresentations" led to his "continued detention[.]"   (*Id.* 21 (alteration added)).

The Court construes Plaintiff's descriptions of the events as an attempt to proffer two theories — commencement and continuation — for a single claim of malicious prosecution.   On the first, the Court agrees with Plaintiff that he need only show an absence of probable cause at the start of the proceeding.   On the second, the Court agrees with the Government that Plaintiff must show a continued absence of probable cause throughout the entire process.

*ii.   "Independent" probable cause*

Next, the Court considers the relevance of information beyond what was presented in the

Government's case.  Plaintiff argues the Government is limited to proving probable cause via information it actually presented — first, before the grand jury, at the indictment stage; then, before courts, at detention hearings.  (*See id.* 23–26; Pl's Reply 19–20).  The Government insists it can prevail so long as there was probable cause, even if that probable cause existed "independent of" the Indictment.  (Gov't's Resp. 4).  This dispute, in large part, arises from a lack of clarity regarding the theories underlying Plaintiff's claim.

The Government is correct that probable cause is an objective standard.  (*See* Gov't's Mot. 13 (citing *Rankin v. Evans*, 133 F.3d 1425, 1433–34 (11th Cir. 1998)).  It is also correct that it had no obligation to present its entire case to the grand jury.  (*See* Gov't's Resp. 24 (citing *Zargari v. United States*, No. 13-23806-Civ, 2015 WL 1587942, at *5 (S.D. Fla. Apr. 9, 2015)))).  Indeed, under Florida law, the focus of the probable cause inquiry in malicious prosecutions is on whether the "*defendant* lacked probable cause[.]"  *Alvarez-Mena v. Miami-Dade Cnty.*, 305 So. 3d 63, 67 (Fla. 3d DCA 2019) (emphasis in original; other emphases, quotation marks, and citation omitted); *see also Floyd v. Stoumbos*, No. 22-11679, 2023 WL 2592297, at *2 (11th Cir. Mar. 22, 2023) (interpreting Florida law to "evaluate probable cause from the perspective of the malicious prosecution defendant" (citations omitted)).  This language does not suggest the Court's inquiry is limited to information presented to the grand jury.[8]

But  Plaintiff's theory focuses, at least in part, on the Government's alleged misrepresentations.  (*See* Pl.'s Mot. 4–19).[9]  Even if the Government "independently" determined

---

[8] The Court would reach the same conclusion under formulations of the requirement that look to whether probable cause existed more generally.  *See Debrincat*, 217 So. 3d at 70 (considering only whether "there was an absence of probable cause for the original proceeding" (citation omitted)).

[9] To the extent Plaintiff argues the Government lacked probable cause outright, the Court addresses that argument below, considering all the evidence the Government had.  *See Alvarez-Mena*, 305 So. 3d at 68.  But the Court also reiterates that the grand jury Indictment is *prima facie* evidence of probable cause.  *See Ware*, 971 F. Supp. at 1462–63.

it had sufficient probable cause, its prosecution could still be malicious if Plaintiff was indicted or detained based on bad faith misrepresentations. *See Glass v. Parrish*, 51 So. 2d 717, 720 (Fla. 1951) ("[T]he good faith of the defendant is an essential element in the defense of probable cause; . . . even though a defendant shows reasonable grounds of suspicion . . . if it be apparent that he did not himself believe in the guilt of the accused, then the circumstances upon which he relied will not suffice to shield and vindicate him" (alterations added; citation and quotation marks omitted)); *Delacruz v. State*, 603 So. 2d 707, 709–10 (Fla. 2d DCA 1992) (noting that testimony from a separate hearing "cannot be used to bolster the affidavit that was before the magistrate who issued the warrant[,]" because the magistrate could not have issued the warrant on the basis of "information . . . not before the issuing magistrate" (alterations added; citation omitted)).[10]

The Court's analysis of Plaintiff's *commencement* theory thus necessarily focuses on the Government's conduct before the grand jury — not on whether the Government had additional information it never presented. Similarly, to analyze Plaintiff's *continuation* theory, the Court can consider additional information the Government had in seeking to continue its prosecution of him — again, keeping in mind what was presented to the reviewing courts at the time.[11]

---

[10] As Plaintiff emphasizes, this is in line with how federal courts have interpreted malicious prosecution claims brought under the Fourth Amendment. (*See* Pl.'s Mot. 23 (citing *Williams v. Aguirre*, 965 F.3d 1147, 1162 (11th Cir. 2020) (noting that "an otherwise insufficient affidavit cannot be rehabilitated with information possessed by the officer when he sought the warrant but not disclosed to the issuing magistrate" (alterations adopted; citations and quotation marks omitted)))). As the Government notes, however, Plaintiff's cited cases are not directly applicable to state law claims. (*See* Gov't's Resp. 25–26). Plaintiff cites to an Eleventh Circuit case suggesting that the federal rule "applies with equal force to state common law malicious prosecution claims." (Pl.'s Mot. 24–25 (citing *Paez v. Mulvey*, 915 F.3d 1276, 1292 (11th Cir. 2019))). But, read in context, that statement refers to the court's application of its own constitutional probable cause analysis to the state claim and arguments raised by the parties, and not the wholesale adoption of federal standards into Florida law. *See Paez*, 915 F.3d at 1292 (referring to "[o]ur Fourth Amendment [section] 1983 probable cause analysis" (emphasis in original; alterations added)).

[11] For this reason, the Court declines to reach the parties' extensive, additional disputes about facts "independent" of the Indictment and detention hearing. (*See, e.g.*, Gov't's Mot. 26; Pl.'s Resp. 19–20; 25–26; Gov't's Reply 15). Should these facts become relevant at trial, the parties are free to raise them.

Of course, this analysis does not require the Court to close its eyes to evidence in the record that was not presented. Quite the opposite. Plaintiff's theory is that, taking into account *everything* the Government knew and did not know, there was no probable cause for its actions, and the Government misled the grand jury and the courts in stating otherwise. (*See* Pl.'s Mot. 4–19). The Court cannot evaluate the possibility of fraudulent misrepresentations by the Government without considering the whole universe of information available to it at the time. Thus, the Court considers the entirety of the record before it, including information not presented, but adjusts its inquiry in light of Plaintiff's two proffered theories.[12]

### b. Merits of probable cause arguments

Having outlined what it will and will not consider, the Court now turns to the central inquiry: whether either party is entitled to summary judgment on the issue of probable cause. As noted, this requires answering two questions. First, was there probable cause to commence prosecution by seeking Plaintiff's indictment? (*See id.* 5–18). Second, was there probable cause to continue prosecution by seeking Plaintiff's detention? (*See id.* 19–23).

### i. Malicious commencement theory

The Court begins, of course, with the law. Generally speaking, "[p]robable cause exists

---

[12] In its Response to Plaintiff's Motion, the Government takes issue with the number of misrepresentations Plaintiff asserts. (*See* Gov't's Resp. 5 n.5). Both parties agree Plaintiff previously alleged five fraudulent statements made by the Government: that Plaintiff (1) was involved with violence carried out by the Pakistani Taliban; (2) sent money to a Pakistani Taliban commander; (3) participated in a conversation with Hafiz calling for violence; (4) sent money to Amina, intending for her to send it to the Pakistani Taliban; and (5) participated in a conversation with Hafiz about "Sharia people" (meaning the Pakistani Taliban). (*See id.* (citing Am. Compl. ¶¶ 14, 17, 18, 19, 21)). In his Motion, Plaintiff identifies other fraudulent statements as well (*see* Pl.'s Mot. 4–18), which the Government argues he cannot do without amending his Complaint (*see* Gov't's Resp. 5 n.5). As explained, the Court concludes there are genuine disputes of material fact within the five allegedly fraudulent statements both parties agree are properly raised. Because it can decide the Motions based on those statements alone — and because the Government only raises the issue in its Response and does not seek summary judgment on any other statements (*see generally* Gov't's Mot.; *see also* Pl.'s Resp. 13–14) — the Court does not reach this issue.

when the totality of the facts and circumstances within an officer's knowledge sufficiently warrant a reasonable person to believe that, more likely than not a crime has been committed." *Alvarez-Mena*, 305 So. 3d at 68 (alteration added; citation and quotation marks omitted). This determination involves "the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Id.* (alteration added; citation and quotation marks omitted). As explained, a grand jury's indictment is *prima facie* evidence of probable cause; certainly, the Court can, if presented with a good reason, decline to defer to the grand jury's conclusion. *See Ware*, 971 F. Supp. at 1462–63.

Further, under Florida law, "a lack of probable cause may be established by proof that a criminal proceeding was instituted on facts that could as well be explained innocently." *Alterra Healthcare Corp.*, 78 So. 3d at 602 (alteration adopted; citation and quotation marks omitted). "Because a malicious-prosecution defendant's good faith is an essential element to be considered on the question of probable cause, if it appears that further investigation is justified before instituting a proceeding, liability may attach for failure to do so." *Id.* (citations and quotation marks omitted). This is "especially" true "where [potentially exculpatory] information is readily obtainable, or where the accused points out the sources of the information." *Harris*, 482 So. 2d at 1382 (alteration added; footnote call number omitted); *see also City of St. Petersburg v. Austrino*, 898 So. 2d 955, 959–61 (Fla. 2d DCA 2005) (upholding judgment against a city on a false arrest claim based on the arresting officer's failure to adequately investigate).

Importantly, questions as to whether further investigation was warranted are questions of fact best resolved at trial and not on summary judgment. *See Alterra Healthcare Corp.*, 78 So. 3d at 603 (noting that a "jury could — and apparently did — conclude that a further investigation was necessary" (citation omitted)); *Weissman v. K-Mart Corp.*, 396 So. 2d 1164, 1168 (Fla. 3d DCA

1981) (reversing summary judgment because a jury should have decided whether a defendant should have made inquiries to a cashier before pressing shoplifting charges); *Liabos v. Harman*, 215 So. 2d 487, 489 (Fla. 2d DCA 1968) (reversing summary judgment because "a jury may well decide that further investigation was warranted").

Plaintiff asserts the Government misled the grand jury.  (*See* Pl.'s Mot. 5–18).  To show this, he points to information that he states the Government ignored, omitted, or failed to obtain.  (*See id.*).  The Government, naturally, disputes Plaintiff's interpretation of this information.  (*See generally* Gov't Resp.).  The net effect is this: the parties point the Court to largely the same factual record, but the stories they tell are functionally irreconcilable.  In such situations, where "reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment" and proceed to trial.  *Whelan v. Royal Caribbean Cruises Ltd.*, No. 12-cv-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citations omitted).  Further, the Court concludes genuine disputes of material fact remain in this case, rendering summary judgment inappropriate.[13]

Certainly, there is information in the record that could have given rise to a reasonable suspicion that Plaintiff was involved in funding the Taliban.  For example, Plaintiff's relatives suggested he supported the Pakistani Taliban and otherwise had conversations with him alerting him to their own support of the organization.  (*See* Gov't SOF ¶¶ 34, 38–39; Pl.'s Resp. SOF ¶¶ 34, 38–39).  Further, evidence in the record suggests Hafiz and Amina sought to solicit funds from

---

[13] Even if the Court believed no genuine disputes of material facts exist, it would not decide this case on the factual record before it.  The complex and discretionary decisions involved in this case raise the kinds of issues that "would benefit from a full hearing."  *Lind v. United Parcel Serv.*, Inc., 254 F.3d 1281, 1285 (11th Cir. 2001) (citation and quotation marks omitted) (noting that "even in the absence of a factual dispute, a district court has the power to deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial" (citation and quotation marks omitted)).

Plaintiff for the purpose of funding the Taliban.  (*See* Gov't's SOF ¶¶ 44–45; Pl.'s Resp. SOF ¶¶ 44–45 (disputing Plaintiff's knowledge of the facts, but not the facts)).  Eventually, although his motivation is in dispute, Plaintiff sent funds to Amina.  (Pl.'s Resp. SOF ¶ 53).  A reasonable factfinder could conclude, on these facts, that the Government had probable cause to act as it did in seeking and supporting the Indictment.

A reasonable factfinder could also conclude the Government did not have probable cause. As discussed, the Government's good faith in asserting the truth of its statements to the grand jury is also relevant to whether probable cause existed.  *See Glass*, 51 So. 2d at 720; *Delacruz*, 603 So. 2d at 709–10.  Here there is information in the record suggesting the Government knew its case had holes.

By its own admission, the Government built a largely circumstantial case against Plaintiff. (*See* Gov't's Resp. SOF ¶ 73).  Even now, the Government has no direct evidence that Plaintiff knew Hafiz and Amina explicitly discussed collecting funds for the Pakistani Taliban; its evidence is only that Amina told Hafiz she discussed with Plaintiff a plan for collecting funds for humanitarian relief.  (*See* Gov't's SOF ¶¶ 44–45, 72; Pl.'s Resp. SOF ¶¶ 44–45, 72; Gov't's Reply SOF ¶¶ 44–45, 72).[14]  In fact, in Hafiz's conversations with Plaintiff, they discussed a cousin known to be an *anti*-Taliban fighter (*see* Pl.'s Resp. SOF ¶¶ 79–80; Gov't's Reply SOF ¶¶ 79–80); and suggested that Plaintiff specifically did not want for his transfer to reach the relative (and Pakistani Taliban member) the Government insists colluded with Amina (*see* Pl.'s Resp. SOF ¶¶ 55–56; Gov't's Reply SOF ¶¶ 55–56).

Further, while the Government maintains "the Khan family" was aware of Amina's

---

[14] The record suggests the Government knew Hafiz and Amina likely invoked humanitarian relief to manipulate others into donating funds that were actually intended for the Pakistani Taliban.  (*See* Gov't's SOF ¶¶ 44–45; Pl.'s Resp. SOF ¶¶ 44–45; Gov't's Reply SOF ¶¶ 44–45).

involvement with the Pakistani Taliban (Gov't's SOF ¶ 71), it declines to cite more specific evidence to demonstrate Plaintiff himself knew of this (*see* Pl.'s Resp. SOF ¶ 71; Gov't's Reply SOF ¶ 71). Similarly, the Government only presents evidence that *Hafiz* was aware of Amina's relative safety and financial security when Plaintiff sent her money. (*See* Gov't's SOF ¶ 55; Gov't's Reply SOF ¶ 55). This, at a minimum, creates a genuine dispute of material fact as to whether the Government should have investigated further.

Other additional genuine disputes of material fact remain as to the issues the Government could have further investigated. For example, it remains unclear whether Amina might have needed $500 for personal use. Plaintiff maintains that Amina's statement to Hafiz about securing housing and having her needs met did not mean that "all of her financial needs as a refugee (i.e. food, clothing, medicine, etc.)" were met. (Pl.'s Resp. SOF ¶ 55). Similarly, it remains unclear whether the Government's use of the phrase "Sharia people" was reasonable. Plaintiff points out that an FBI translator warned SA Janssen the phrase was "a definite mistranslation[.]" (Pl.'s SOF ¶ 100 (alteration added; emphasis omitted)). The Government maintains the translator was discussing a different portion of the call in which Hafiz and Plaintiff discuss the "Shariat people" (Gov't's Resp. SOF ¶ 100); Plaintiff insists the portion referred to by the translator was the basis for the Government's later misrepresentation (*see* Pl.'s Reply SOF ¶ 100).

Perhaps most contested is the issue of whether Plaintiff sent money to a Taliban commander named Akbar Hussein or, as he claims, to a relative named Akbar Hussain. Plaintiff's transfers to Akbar are recorded in Western Union records containing the recipient's Pakistani identification number ("PID"). (*See* Pl.'s SOF ¶ 35). Plaintiff maintains the Government had access to documents showing his relative, Akbar Hussain, had a PID matching that of the recipient. (*See* Pl.'s Reply SOF ¶ 35 & n.12). He also maintains that the Government should have known

from publicly available information that the recipient's PID did not match that of Akbar Hussein, the Pakistani Taliban commander. (*See* Pl.'s SOF ¶ 35). The Government denies it had this information at the time of its investigation. (*See* Gov't's SOF ¶ 111; Gov't's Resp. SOF ¶ 35).

Similarly, the Government asserts that Plaintiff provided shifting, inconsistent explanations for the transfers, citing a declaration by SA Janssen. (*See* Gov't's SOF ¶¶ 108–10). Plaintiff emphasizes that the Government's only other evidence for these assertions is another SA's notes from an interview. (*See* Pl.'s Resp. SOF ¶¶ 108–10). He also maintains that he consistently informed the Government of Akbar Hussain's identity from the start of the investigation. (*See id.*). These irreconcilable assertions create additional, genuine disputes of material fact.[15]

### ii. Malicious continuation

Having determined neither party is entitled to summary judgment on Plaintiff's malicious commencement theory, the Court turns to Plaintiff's malicious continuation theory. Plaintiff argues the Government maliciously continued his prosecution by failing to investigate Akbar's identity and misrepresenting that Akbar was a Taliban commander at detention hearings. (*See* Pl.'s Mot. 19–23). According to the Government, "any failure . . . to investigate . . . did not cause [Plaintiff's] prosecution to continue" because the case, at that point, was entirely in the hands of federal prosecutors. (Gov't's Resp. 20–21 (alterations added)).[16]   Plaintiff also argues the

---

[15] The parties also dispute a web of facts about who withdrew the funds, where and how they were withdrawn, and who is responsible for apparent inconsistencies in the Western Union records. (*See, e.g.*, Gov't's Resp. SOF ¶ 35; Pl.'s Reply SOF ¶ 35; Pl.'s Resp. SOF ¶¶ 105–06; Gov't's Reply SOF ¶¶ 105–06).

[16] Aside from arguing that the SAs in this case did not seek to continue the prosecution — and therefore were not its legal cause (*see* Gov't's Mot. 28–31) — the Government does not raise or otherwise seek summary judgment on this theory (*see generally id.*).

Government maliciously continued his prosecution by misrepresenting the evidence in its possession. (*See* Pl.'s Mot. 19–23). The Government responds that any statements made at the detention hearings could not have continued Plaintiff's prosecution because the probable cause findings at those hearings were all premised on the grand jury Indictment. (*See* Gov't's Resp. 21–23).

Applying the principles outlined above, the Court has no trouble reaching the same conclusion: summary judgment is inappropriate on this theory as well. A genuine dispute of material fact remains as to whether the SAs were sufficiently involved with Plaintiff's prosecution so as to be the legal cause of it. Further, an individual other than the prosecutor of record may also be the legal cause of a prosecution if "he or she withholds information which could have caused the cessation of criminal proceedings against the plaintiff." *Alterra Healthcare Corp.*, 78 So. 3d at 603 (citation omitted). Because a genuine dispute of material fact remains as to the sufficiency of the Government's investigation, a genuine dispute of material fact also remains as to whether the Government can be liable for restating its case in seeking Plaintiff's continued detention.

Further, the Government may also be the legal cause of Plaintiff's prosecution if it "gave information to authorities which [it] should have known to be false" and which proved to be "the determining factor[.]" *Id.* (alterations added; citation and quotation marks omitted). Because, as discussed, a genuine dispute of material fact remains as to whether the Government sought the grand jury Indictment in good faith, a genuine dispute of material fact likewise remains as to whether it is liable for continuing to rely on the Indictment at later stages of the proceeding.

### 3. *Malice*

This leaves the question of malice. "In an action for malicious prosecution[,] it is not necessary for a plaintiff to prove actual malice; legal malice is sufficient and may be inferred from,

among other things, a lack of probable cause, gross negligence, or great indifference to persons, property, or the rights of others." *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1357 (Fla. 1994) (alteration added; citation omitted).  Plaintiff argues he is entitled to summary judgment because malice can be inferred.  (*See* Pl.'s Mot. 26–27).  The Government, having argued that probable cause existed, insists "there is nothing from which to infer malice." (Gov't's Resp. 25). Further, the Government states inferences of malice are inappropriate on summary judgment.  (*See id.*).

Admittedly, federal courts have been inconsistent in deciding whether the decision to infer malice is a question of law or fact.  *Compare Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1126 (S.D. Fla. 2019) (leaving to a jury "whether [defendants] acted with malice" (alteration added), *with Douglas v. United States*, 796 F. Supp. 2d 1354, 1367 (M.D. Fla. 2011) (inferring malice "as a matter of law").  It appears that Florida courts treat it as a question of fact, *see Harris*, 482 So. 2d at 1382 n.18; *Alamo Rent-A-Car, Inc.*, 632 So. 2d at 1357, although this distinction is less important here due to this case being resolved at a bench trial.  In any event, having concluded that the issue of probable cause must go to trial, the Court concludes the question of malice — and any determination of damages, if applicable — must follow.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant, the United States of America's Motion for Summary Judgment **[ECF No. 287]**, and Plaintiff, Irfan Khan's Motion for Summary Judgment **[ECF No. 295]** are **DENIED**.

CASE NO. 13-24366-CIV-ALTONAGA/Damian

**DONE AND ORDERED** in Miami, Florida, this 18th day of January, 2024.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

25