```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                       CASE NO. 13-cv-24366-CMA
 3

 4    IRFAN KHAN,                        Miami, Florida

 5            Plaintiff,                 March 19, 2024

 6        vs.                            10:04 a.m. to 11:36 a.m.

 7    UNITED STATES OF AMERICA,          Courtroom 13-3

 8            Defendant.                 (Pages 1 to 35)

 9    _____

                             BENCH TRIAL
10           BEFORE THE HONORABLE CECILIA M. ALTONAGA,
                  CHIEF UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

13    FOR THE PLAINTIFF:      KEITH R. MITNIK, ESQ.
                              Morgan & Morgan, P.A.
14                            P.O. Box 4979
                              Orlando, FL 32802-4979
15                            (407) 849-2383
                              kmitnik@forthepeople.com

16                            MICHAEL N. HANNA, ESQ.
                              Morgan & Morgan, P.A.
17                            2000 Town Center, Suite 1900
                              Southfield, MI 48075
18                            (313) 251-1399
                              (313) 739-1956
19                            mhanna@forthepeople.com

20                            CHARLES D. SWIFT, ESQ.
                              Muslim Legal Fund
21                            100 North Central Expressway,
                              Suite 1010
22                            Richardson, TX 75080
                              (972) 914-2507
23                            cswift@clcma.org

24

25
```

```
1   APPEARANCES CONTINUED:

2     FOR THE DEFENDANT:        CARLOS J. RAURELL, ESQ.
                                JOHN S. LEINICKE, ESQ.
3                               SOPHIA M. IVASHKIV, ESQ.
                                Assistant United States Attorneys
4                               99 Northeast 4th Street
                                Miami, FL 33132
5                               (305) 961-9001
                                carlos.raurell@usdoj.gov
6                               john.leinicke@usdoj.gov

7     Also Present:             Meredith Ketchum, Paralegal

8     REPORTED BY:              STEPHANIE A. McCARN, RPR
                                Official Court Reporter
9                               400 North Miami Avenue
                                13th Floor
10                              Miami, Florida 33128
                                (305) 523-5518
11                              Stephanie_McCarn@flsd.uscourts.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                            I N D E X

 2                            WITNESSES

 3

 4    WITNESSES FOR THE PLAINTIFF:                      Page
                                                         --
 5

 6

 7    WITNESSES FOR THE DEFENDANT:                      Page
                                                         --
 8

 9
      EXHIBITS IN EVIDENCE               IDENTIFIED   ADMITTED
10
        Plaintiff's Exhibit No.              --          --
11
        Defendant's Exhibit No.              --          --
12

13

14

15
                           MISCELLANEOUS
16
                                                       Page
17    Proceedings.......................................    4
      Court Reporter's Certificate.....................   35
18

19

20

21

22

23

24

25
```

1      (The following proceedings were held at 10:04 a.m.)

2          COURT SECURITY OFFICER:  All rise.

3          THE COURT:  Good morning.  Please be seated.

4          In accordance with Federal Rule of Civil Procedure

5   52(a), I make the following findings of fact and conclusions of

6   law regarding the liability phase of this trial.  Under

7   Rule 52(a), the findings and conclusions may be stated on the

8   record after the close of the evidence.  In doing so, I must

9   find the facts specially and state my conclusions of law

10  separately.  Before doing so, I give some general background.

11         This case arises out of the arrest and the detention

12  of the Plaintiff, Irfan Khan, a United States citizen, who

13  worked in this country since his arrival and did not have a

14  criminal record until he was charged by a grand jury with

15  conspiring to provide and providing material support to a

16  conspiracy, the object of which was to murder, kidnap or maim

17  persons overseas, as well as conspiring to provide material

18  support to the Pakistani Taliban, a Foreign Terrorist

19  Organization.

20         In support of that conspiracy charge, the Indictment

21  listed four overt acts in which Plaintiff allegedly

22  participated:  Three transfers of money made by wire transfer

23  to an Akbar Hussain in April and May of 2008; participation in

24  a conversation with the Plaintiff's father, Hafiz Khan, in June

25  2009, during which call Hafiz called for a terrorist attack; a

Proceedings
March 19, 2024
Irfan Kahn v. United States of America, 13-cv-24366-CMA

1    wire transfer to Plaintiff's sister, Amina Khan, who the

2    Government alleged was collecting money for the Pakistani

3    Taliban; and participation in a conversation with Hafiz Khan

4    during which the two discussed sending money to the Sharia

5    people, after which Hafiz then called for another attack.

6         The Indictment did not describe any overt acts by the

7    Plaintiff after 2009 or show any incident in which the

8    Plaintiff personally called for violence.

9         At the grand jury proceedings, an agent with the

10   Federal Bureau of Investigation testified to Hafiz's actions

11   and the actions of his alleged coconspirators, including the

12   Plaintiff.  The agent testified that the Indictment was correct

13   to the best of his knowledge with respect to the investigation.

14   He also indicated his testimony did not cover every single fact

15   known to him and others regarding the matter.

16        When he was asked about a transcript of a call between

17   Hafiz and the Plaintiff, the special agent said that the two

18   discussed the need to repeat a violent incident similar to a

19   previous suicide bombing, this time directed at the Pakistani

20   Government.  He agreed, that is the agent agreed, that this

21   conversation was one of the overt acts described in the

22   Indictment.

23        The FBI special agent testified that the Plaintiff

24   said he would like to send money to the Sharia people, and that

25   he currently, at the time of that call or conversation, did not

Proceedings
March 19, 2024
Irfan Kahn v. United States of America, 13-cv-24366-CMA

1    have money.

2          MR. HANNA:  Your Honor, I am so sorry to stop you.  Is

3    there any way to take Mr. -- Mr. Mitnik off hold.  He is

4    telling me he is still on hold.

5        (Pause in proceedings.)

6          THE COURT:  Thank you.

7          Mr. Mitnik, this is Judge Altonaga, I will continue.

8          MR. MITNIK:  Thank you for letting me appear by phone.

9          THE COURT:  All right.  The agent agreed that that

10   conversation was also an overt act.  In discussing the transfer

11   of funds for the Pakistani Taliban, the agent included a $500

12   payment that the Plaintiff had made to his sister Amina.  The

13   agent again indicated that was an overt act.  The agent

14   testified the reason for that payment was to avoid suspicion or

15   scrutiny.

16          In discussing another of the overt acts, the agent

17   highlighted the Plaintiff's transfers of $990 and two transfers

18   of $980, each to Akbar Hussain.  The agent did not elaborate on

19   Akbar Hussain's identity.

20          During the grand jury testimony, the agent sometimes

21   referred to "others" or to "codefendants."  Some of these

22   statements implicated the Plaintiff.  For example, after

23   discussing the money that Hafiz and others had sent, the agent

24   agreed that some of this money was for the purchase of guns for

25   the Taliban.  Shortly before making this statement, the agent

Proceedings

March 19, 2024

Irfan Kahn v. United States of America, 13-cv-24366-CMA

1   testified at length about the Plaintiff's transfer of funds to

2   Amina, which again the indictment alleged was for the Pakistani

3   Taliban.

4        The agent confirmed that Hafiz and the other

5   codefendants were generally supportive of violence inflicted by

6   the Pakistani Taliban, and that neither Khan nor any of the

7   codefendants ever wavered from their ultimate goal of the

8   Pakistani Taliban implementing Sharia.

9        The agent agreed that Hafiz Khan and others provided

10  other support to the group.  This was all in line with the

11  Indictment's allegations that the Plaintiff knowingly and

12  willingly conspired to provide material support to the

13  Pakistani Taliban.

14       The grand jury indicted the Plaintiff on May 12, 2011.

15  Plaintiff was arrested and placed in solitary confinement on

16  May 14, 2011, in California.  On June 7, 2011, he was

17  transferred here to Miami and held in solitary confinement

18  until his release on bond on March 28, 2012.

19       At a detention hearing, another FBI special agent

20  largely reiterated the Government's case as it had been

21  presented to the grand jury.  This time, however, that agent

22  also testified that Akbar Hussain was a Taliban commander.

23       Plaintiff's detention was continued by Court order.

24       On June 13, 2012, the Government dropped all charges

25  against the Plaintiff.  Plaintiff filed his amended complaint

1    on May 7, 2014.  And what has been tried during the liability

2    phase of this trial, the issue of damages having been

3    bifurcated, is Plaintiff's malicious prosecution claim, the

4    only claim remaining.

5            According to the Government -- I'm sorry, according to

6    the Plaintiff, the Government knew that he disapproved of the

7    Pakistani Taliban, and he expressed distress for those hurt by

8    its tactics, as well as distaste for the idea that Islam could

9    be established by force.

10           Plaintiff asserts that the Government knew and ignored

11   important contextual information for his actions and his words.

12   For example, that Akbar Hussain, despite having a similar name

13   to a Pakistani Taliban leader, was Plaintiff's relative; that

14   Amina, his sister, was a displaced war refugee in need of

15   support; and that Sharia people was a phrase susceptible to

16   innocuous translation.

17           The Government for its part insists that there was

18   evidence to support its belief that Akbar was a Pakistani

19   Taliban commander, that Amina was, in fact, safe and not in

20   need of financial support, and Sharia people was reasonably

21   understood to be a reference to the Pakistani Taliban.

22           The Government points to Plaintiff's well founded

23   concerns that he and his family were being surveilled as

24   further evidence of Plaintiff's guilt.  The Government argues

25   it had probable cause to prosecute the Plaintiff.  The

1   Government argues that the agents the Plaintiff accuses of

2   wrongdoing were not the legal cause of his prosecution, which

3   was, in fact, controlled by federal prosecutors who are immune

4   from suit.

5           So to prevail on his malicious prosecution claim,

6   Plaintiff must prove six things:  One, that a judicial

7   proceeding existed against him, the Plaintiff; two, that the

8   Government was the legal cause of that proceeding; three, the

9   proceeding ended with a bona fide termination in Plaintiff's

10  favor; four, no probable cause existed for that proceeding;

11  five, the Government acted with malice; and six, Plaintiff was

12  damaged by the proceeding.

13          Those six elements are laid out in the decision of

14  *Debrincat v. Fischer, 217 So.3d 68* (Florida Supreme Court

15  2017).

16          Regarding the first element, there is no question that

17  a judicial proceeding existed against the Plaintiff.  Given

18  bifurcation, I will not be addressing the sixth element,

19  damages.

20          I will now find the facts specially and state my

21  conclusions of law separately addressing only four of the

22  elements at issue:  A bona fide termination in Plaintiff's

23  favor, legal causation, lack of probable cause and malice.

24          Regarding the existence of a bona fide termination in

25  Plaintiff's favor, I will first address the law.  In *Union Oil*

1   *of California* versus -- I'm sorry, *Amsco Division v. Watson at*

2   *468 So.2d 349* (Florida 3d DCA 1985), the Court announced that

3   in some cases a voluntary dismissal does reflect on the merits

4   as where the record contains evidence indicating a lack of

5   probable cause.  The termination need only indicate the

6   innocence of the accused and reflect on the merits of the case.

7   For example, where a dismissal is taken because of

8   insufficiency of the evidence.

9         Furthermore, as stated in *Gatto v. Publix Supermarket,*

10  *Inc., 387 So.2d 377* (Florida 3d DCA 1980), abandonment of the

11  prosecution by the prosecuting attorney may be sufficient where

12  it has the effect of ending the particular proceeding and

13  requiring new process or other official action to commence a

14  new prosecution.  In this regard, I also cite to *Weissman v.*

15  *K-Mart Corporation, 396 So.2d 1164* (Florida 3d DCA), concluding

16  that discharge of a case for lack of prosecution was a bona

17  fide termination in the Plaintiff's favor.

18        Now, termination may not be favorable where the

19  dismissal is technical or procedural.  For example, a case

20  cannot have been dismissed due to a settlement because the

21  accused thwarted trial, because the proceeding was abandoned

22  out of mercy or where new proceedings have already been

23  instituted.  For these points, I cite *The Restatement (Second)*

24  *of Torts, Section 660* (1997), which is cited by the Courts in

25  Florida.

1    Whether there was a bona fide termination in the

2 Plaintiff's favor is a mixed question of law and fact.  For

3 that point, I cite to *Alamo Rent-A-Car, Inc., v. Mancusi, 632*

4 *So.2d 1352* (Florida 1994).

5    The determination depends on the circumstances under

6 which the withdrawal occurs, citing *Union Oil at 468 So.2d at*

7 *353*.  The trier of fact is allowed to consider the disputed

8 circumstances, and for that I cite *Alamo Rent-A-Car, 632 So.2d*

9 *at 1356*.

10    Yet it appears the final conclusion is a question of

11 law, again citing *Union Oil, 468 So.2d at 355*.  And here are my

12 findings of fact in this regard.  Neither party has explicitly

13 explained why the charges here were dismissed, yet the

14 Government has offered an explanation that it was precipitated

15 by changes to translations of several of the recorded calls.

16 That seems to reflect therefore on the merits and provides no

17 basis for a purely procedural dismissal.  And none of the other

18 circumstances surrounding the dismissal as presented in this

19 trial suggest the dismissal was for procedural reasons.

20    Furthermore, as I will go on to explain, there is

21 evidence in the record indicating a lack of probable cause.

22    My conclusion of law is that there is a bona fide

23 termination in Plaintiff's favor satisfying that element of

24 Plaintiff's malicious prosecution claim.

25    I turn now to a discussion of legal causation, again

1    beginning with the applicable law.  In this regard I cite to

2    *Harris v. Lewis State Bank, 482 So.2d 1378* (Florida 1st DCA

3    1986).  The test for legal causation looks to whether the

4    Defendant's action was the proximate and efficient cause of

5    putting the law in motion.  Although one may not have intended

6    to institute a criminal proceeding, he may be liable if he

7    afterward continued the prosecution or gave it momentum.

8            In *Ware v. United States, 971 F.Supp. 1442* (Middle

9    District of Florida 1997), the Court noted that law enforcement

10   officers are not immune from liability merely because they are

11   not the prosecutors of record, rather in determining whether an

12   officer was the legal cause of a proceeding.  The Court engages

13   in a case-specific inquiry that considers whether the officer

14   played a key role or took an active part in the proceedings,

15   citing to *Ware* at Pages 1461 and 1462.

16           And these are my findings of fact with regard to this

17   element.  Before the grand jury, an FBI special agent testified

18   that, as case agent, he manages and oversees everything that

19   happens in the investigation.  Another agent testified that

20   that grand jury testifying agent had the overall

21   responsibility.

22           There's been testimony in this trial that case agents

23   play an active role in crafting grand jury testimony and can

24   push back against unsupported statements.

25           The record here shows that agents testified in support

1   of grand jury testimony and detention, and that they were

2   active investigators before and after the process.

3        I note that at the summary judgment briefing, the

4   Government represented that a federal prosecutor in the

5   underlying case filed a declaration indicating that none of the

6   special agents who investigate Plaintiff participated in the

7   decisions to charge him or to continue the prosecution

8   following his indictment, nor did any of the special agents

9   improperly influence those decisions.  Curiously, that

10  prosecutor, Sivashree Sundaram, did not testify at the trial.

11       These are my conclusions of law:  The agents in this

12  case continued Plaintiff's prosecution and gave it momentum.

13  They played key roles in that prosecution and took active part

14  in it.  One special agent managed and oversaw everything that

15  happened in the investigation.  His testimony at trial that he

16  was surprised with the decision to charge Plaintiff is at odds

17  with his trial testimony that he still believes Plaintiff is

18  guilty and should not prevail in this case.

19       The agents were legal causes of Plaintiff's

20  prosecution and subsequent detention.  The Government's cited

21  case, *Eubanks v. Gerwen at 40 F.3d 1157* (11th Circuit 1994), is

22  not applicable here because it applies only where law

23  enforcement neither made the decision to prosecute nor

24  improperly influenced it, and it discusses only the standard

25  for malicious prosecution claims brought under Section 1983.

1    I do find that the agents here were much more involved

2  in building the case against Plaintiff and, of course,

3  Plaintiff here has brought his claim under state law.

4       Turning next to the element of probable cause, I begin

5  with the applicable law.  And I quote from *AlvarezMena v.*

6  *Miami-Dade County, 305 So.3d 63, at Page 68* (Florida 3d DCA

7  2019).

8       Generally speaking, "probable cause exists when the

9  totality of the facts and circumstances within an officer's

10 knowledge sufficiently warrant a reasonable person to believe

11 that more likely than not a crime has been committed."  This

12 determination involves "the factual and practical

13 considerations of everyday life on which reasonable and prudent

14 people, not legal technicians, act."

15      Certainly, the grand jury's indictment is *prima facie*

16 evidence of probable cause, yet the Court can, if presented

17 with a good reason, decline to defer to the grand jury's

18 conclusion.  And for that proposition, I cite to *Ware,*

19 *971 F.Supp. at 1462 and 63*.

20      In *Alterra Healthcare Corp. v. Campbell, 78 So.3d 595,*

21 *Page 602* (Florida 2d DCA 2011), the Court wrote:  "A lack of

22 probable cause may be established by proof that a criminal

23 proceeding was instituted on facts that could as well be

24 explained innocently."  The Court goes on to say, "Because a

25 malicious-prosecution defendant's good faith is an essential

1    element to be considered on the question of probable cause, if

2    it appears that further investigation is justified before

3    instituting a proceeding, liability may attach for failure to

4    do so."

5         In *Harris, 482 So.2d at 1382,* the Court said that this

6    is especially true where additional information is readily

7    obtainable or where the accused points out the sources of the

8    information.

9         I also cite to *City of St. Petersburg v. Austrino, 898*

10   *So.2d 955* (Florida 2d DCA 2005) where the Court upheld a

11   judgment against the City on a false arrest claim based on the

12   arresting officer's failure to adequately investigate.

13        Now, whether further investigation is warranted is a

14   question of fact.  I cite to *Alterra Healthcare Corp., 78 So.3d*

15   *at 603*, where the Court noted that a jury could and apparently

16   did conclude that a further investigation was necessary.

17        I also cite to *Weissman at 396 So.2d at 1168*, where

18   summary judgment was reversed because a jury should have

19   decided whether a defendant should have made inquiries to a

20   cashier before pressing shoplifting charges.

21        I also cite to *Liabos v. Harman, 215 So.2d 487 at*

22   *Page 489* (Florida 2d DCA 1968) where summary judgment was

23   reversed because a jury may well decide that further

24   investigation was warranted.

25        Even if the Government independently determines that

Proceedings
March 19, 2024
Irfan Kahn v. United States of America, 13-cv-24366-CMA

1    it had sufficient probable cause, its prosecution may still be

2    malicious if the Plaintiff was indicted or detained based on

3    bad faith misrepresentations.

4           I cite to *Glass v. Parrish, 51 So.2d 717 at Page 720*

5    (Florida 1951).  There the Court stated that the good faith of

6    the Defendant is an essential element in the defense of

7    probable cause.  Even though a defendant shows reasonable

8    grounds of suspicion, if it be apparent that he did not himself

9    believe in the guilt of the accused, then the circumstances

10   upon which he relied will not suffice to shield and vindicate

11   him.

12          I also rely on *Delacruz v. State, 603 So.2d 707 at*

13   *Pages 709 and 710* (Florida 2d DCA 1992) where the Court noted

14   that testimony from a separate hearing cannot be used to

15   bolster the affidavit that was before the magistrate who issued

16   the warrant because the magistrate could not have issued the

17   warrant on the basis of information not before it.

18          I now make my findings of fact on this element.  At

19   issue in this case is whether the Government had probable cause

20   to pursue Plaintiff's indictment for conspiracy to support and

21   actual support provided to the Pakistani Taliban.

22          The Court agrees with the Plaintiff that information

23   existed that the Government ignored, omitted or failed to

24   obtain.

25          Again, the Indictment contained four overt acts.

1    Regarding Overt Act No. 1:  Again, the allegation was that in

2    or around April and May of 2008, Irfan caused three transfers

3    of $990, 980 and $980, respectively, to be made via wire

4    transfer to Pakistan.

5            At the grand jury, the FBI special agent testified the

6    money was going to Akbar Hussain.  No testimony or information

7    was provided to the grand jury about the identity of Akbar

8    Hussain, but because the transaction was alleged to be an overt

9    act in furtherance of a criminal conspiracy, the issue was

10   whether there was probable cause for the Government to

11   characterize this transaction as such.  Based on the

12   information in the record available to the Government at the

13   time of the indictment, there was not.

14           The Government's only proffered evidence before trial

15   was that public source research showed there was an Akbar

16   Hussain -- that public source research only supported the

17   conclusion that there was a Taliban commander with a similar

18   name to the recipient of these funds.  This was insufficient to

19   establish probable cause.

20           We have heard much evidence during this trial about

21   information casting doubt on whether the Taliban commander

22   could plausibly have been the recipient.  For instance, that

23   Taliban commander had left the region recently in relation to

24   those transfers and perhaps had been arrested.  Furthermore, it

25   didn't make sense for the plaintiff to send the money openly

Proceedings
March 19, 2024
Irfan Kahn v. United States of America, 13-cv-24366-CMA

1   given the Government's position that the Plaintiff was sending

2   money surreptitiously.

3          Finally, as we have heard throughout this trial, the

4   name Akbar Hussain is a common name, as evidenced by the

5   Western Union records that the Government had.

6          All of this evidence undermines the reasonableness of

7   the agent's conclusions.  In his first 302, the Plaintiff

8   alerted the Government to the possibility that Akbar Hussain

9   was a family member.  He initially surmised that Hussain was

10  his brother-in-law, and two days later reiterated that Akbar

11  Hussain was his wife's family member.

12         At this trial, the Government produced emails showing

13  that it had acquired preliminary yet incomplete translations of

14  police records linking Plaintiff's brother to the Taliban

15  commander.  The Government's belated claim that this

16  information was the basis of its representation before the

17  grand jury, even though it was not raised as a fact at any

18  deposition or hearing, nor was it ever produced in the course

19  of nearly a decade of discovery in this 2013 civil case, is not

20  credible.

21         Events following the indictment further undermine the

22  Government's assertion that it had at the time of the

23  indictment probable cause to suspect the transfer to

24  Akbar Hussain was in support of a criminal conspiracy, and all

25  of those facts that have been presented during the course of

 1  this trial further suggest the Government did not conduct an

 2  adequate investigation.

 3          For example, six days after the indictment, FBI

 4  special agents were aware and made the Assistant U.S. Attorneys

 5  in the case aware of information regarding a business card

 6  found in the Plaintiff's belongings.  The business card

 7  contained United Kingdom-based numbers for an Akbar Hussain.

 8  Again, this card was found on Plaintiff's person at the time of

 9  his arrest in California.  This business card or cards should

10  have put the agents on notice that there were other leads to

11  investigate.  Yet they did not.

12          In an email following the indictment, the Government

13  requested records for Hussain indicating its belief that his

14  birth date was in the year 1945, making him 17 -- 67 years old

15  in 2012.  This was, in fact, the birth date of Plaintiff's

16  relative.  The Government has not explained how it selected

17  this date from the multiple birth dates in the Western Union

18  records.  The Government has indicated that these multiple

19  birth dates were evidence that there was something suspicious

20  afoot.

21          By this point, the Government also determined, likely

22  from Western Union records, that the recipient's Pakistani ID

23  number was 15602-0271685-9.  This also matched the ID number on

24  the Pakistani passport for the Akbar Hussain who is related to

25  the Plaintiff's wife.

1          Public information for the Taliban commander

2    Akbar Hussain was made available later indicates that his PID

3    number was different from the one I just read, and that he was

4    about 50 years old in the year 2012.  At least some of this

5    information, which has been produced and presented during this

6    trial in this case, could have been acquired by the Government

7    had it conducted an adequate investigation.

8          The Government's continued assertions after the

9    discovery of evidence like this further undermines its

10   credibility regarding the probable cause that it had at the

11   time of the indictment.

12         So based on the foregoing findings, the Court

13   concludes the Government did not have probable cause at the

14   time of the indictment to imply that Akbar Hussain was a

15   Taliban associate.  Furthermore, the Court finds that the

16   Government failed to conduct an adequate investigation into

17   Akbar Hussain's identity, an investigation that would have

18   revealed substantial doubt about whether, in fact, he was a

19   Taliban commander.

20         Overt Act No. 5.  According to the Indictment, on or

21   about June 25, 2009, Hafiz Khan and the Plaintiff participated

22   in a conversation in which Hafiz called for an attack on the

23   Pakistani Assembly that would resemble the September 2008

24   suicide bombing of the Marriott Hotel in Islamabad, Pakistan.

25         On this call, on this intercepted call, Hafiz says:

1    "Man!  I wish it was things...on that...like the Assembly, like

2    what happened at that hotel in Islamabad, you know!  So that

3    while all of them are sitting like that gangster Zardari, so

4    that Allah may take out all these top ones.  It would be good.

5    So as many of our people who have died in our Swat, you

6    know...so if Allah kills the same number of them apostate, it

7    would be very good."

8         Plaintiff's response, "They all...uh...were the poor

9    amongst them, weren't they?"

10        The FBI special agent affirmed that Hafiz Khan and the

11   Plaintiff discussed the need to repeat a violent incident and

12   the need to have another violent incident like the suicide

13   attack at the Marriott Hotel.  He described, he the agent,

14   described this violence as intended for the Pakistani Taliban

15   to impose Sharia.

16        Considering the testimony of the Government's agents

17   and having carefully considered the transcripts of the calls

18   upon which those agents relied, there was not probable cause

19   for the Government's conclusion that it was a statement by the

20   Plaintiff calling for an attack.

21        Overt Act No. 6.  On or about July 10, 2009, Irfan

22   caused $500 to be sent via wire transfer to Amina in Pakistan,

23   Amina his sister.  Before the grand jury, the FBI special agent

24   testified the money was solicited for the Pakistani Taliban but

25   was sent to Amina to avoid suspicion or scrutiny.

1          Again, because the transaction is alleged to be an

2     overt act in furtherance of a criminal conspiracy, I now turn

3     to the issue of whether there was probable cause for the

4     Government to characterize this transaction as such.

5          And again, the Government need not be held liable for

6     failing to investigate or present to the grand jury an

7     alternative explanation for the transaction if, in fact, the

8     Government had probable cause to believe the transaction was in

9     furtherance of a criminal conspiracy.

10          Considering the testimony of the Government's agents

11    and having carefully considered the transcripts of the calls

12    upon which they relied, there was no probable cause for the

13    conclusion that the money was solicited for the Pakistani

14    Taliban, nor the conclusion that it was sent to Amina to avoid

15    suspicion or scrutiny.

16          Despite believing that I would be hearing and seeing

17    transcripts of such calls, the Government has not provided any

18    calls about the solicitation of money for the Pakistani Taliban

19    in which the Plaintiff himself was a participant.  A reasonable

20    reading of the transcript for the conversation in which the

21    Plaintiff was a participant suggests that he agreed to send

22    $500 to Amina for humanitarian aid.

23          Again, the Government's assertion that the statements

24    in context can be reasonably interpreted to suggest Plaintiff

25    sent money to Amina with the intent to further a criminal

1    conspiracy is simply not supported.

2           I will note that in his first 302, the Plaintiff told

3    the Government that he sent money to Amina in 2008 for poor

4    people.

5           Overt Act 14 alleged that on or about August 20, 2009,

6    Khan participated in a conversation with Irfan, that the

7    Plaintiff participated in a conversation with Irfan in which

8    they discussed sending money to the Sharia people, after which

9    there's a call for Pakistani Government officials to be

10   destroyed and eliminated by an explosion.  Sharia people, I

11   have heard much about the term "Sharia people" and what it

12   means.

13          In the phone call, the Plaintiff tells his father

14   Hafiz that he will, at an unspecified later date, send money to

15   the Shariat people.  Later in the call, Hafiz refers to the

16   hypothetical possibility of a change in the Government from the

17   existing regime to people who follow Shariat.  No testimony or

18   information was given to the grand jury about the meaning of

19   Sharia people.

20          Again, because the transaction is alleged to be an

21   overt act in furtherance of a criminal conspiracy, the issue is

22   whether there was probable cause for the Government to

23   characterize this transaction as such.  And the Government has

24   not provided enough evidence or explained why a reasonable

25   reading of the transcript from the call would have allowed it

1    to conclude at the time it sought the indictment that these

2    references were to the Pakistani Taliban.  And, indeed, events

3    after the indictment undermine that conclusion.

4         At the pretrial detention hearing, the Government

5    through its agent asserted that the meaning of Sharia people

6    could be inferred from the phrase that was eventually

7    translated as people who follow Shariat, yet a translator had

8    specifically alerted the Government after the indictment that

9    people who follow Shariat refer to religious people; that is,

10   people who are pious, honest or law-abiding and thus should not

11   be translated as Sharia people.

12        So the Government's continued assertions through the

13   FBI special agent after discussions like this undermine its

14   credibility as to the probable cause it had at the time of the

15   indictment.  Furthermore, the record does not support the

16   Government's subsequent representations made in this case and

17   at trial through its agents that additional context was

18   available to support probable cause for interpreting this call

19   as a reference to funding the Pakistani Taliban at the time the

20   Government sought the indictment.

21        Before trial the only explanation the Government

22   offered about how to interpret Sharia people relied on its

23   translation of people who follow Shariat.

24        With respect to this call for an attack, in the call

25   Hafiz Khan says, "May Allah do something to them.  May Allah

1   cool them off" -- that is kill them -- "by a cannon.  May Allah

2   cool them with a divine cannon.  That all of them get cool," or

3   killed.  "This government of Frontier is also very dishonest."

4   Then Hafiz says, "May Allah destroy all those people.  I wish

5   that they do a blast in the Assembly and destroy them all."

6          In response to the first statement, the Plaintiff is

7   heard saying, "They are huge bastards."  It's altogether

8   unclear what the Plaintiff says in response to the second

9   statement.

10          Considering the testimony of the Government's agents

11   and reviewing transcripts of the calls upon which the

12   Government relied, there was no probable cause for the

13   conclusion that these statements were a call for an attack or

14   that Plaintiff participated in such a call.

15          So my conclusions of law in this regard are that the

16   Plaintiff has presented enough information to set aside the

17   *prima facie* evidence raised by the grand jury's indictment.

18   The grand jury dependent -- depended on the Government through

19   its agents to interpret the relevant calls.  And the Government

20   through its agent represented the calls were only part of the

21   evidence that the Government had.

22          At the time it sought the indictment, the Government

23   did not have probable cause for any of the overt acts alleged

24   in the indictment.  Furthermore, the Government failed to

25   conduct a reasonable investigation and then made material

1  misrepresentations when it, through an agent, testified about

2  the overt acts.

3       Malice, the final element that the Plaintiff must

4  prove in this liability phase of the trial that is at issue.

5       And I quote from *Alamo Rent-A-Car, 632 So.2d at 1357*.

6  "In an action for malicious prosecution, it is not necessary

7  for a Plaintiff to prove actual malice.  Legal malice is

8  sufficient and may be inferred from, among other things, a lack

9  of probable cause, gross negligence or a great indifference to

10 persons, property or the rights of others.

11       Citing to *Harris, 482 So.2d at 1382 at Note 18* and

12 *Alamo Rent-A-Car at 632 So. 2d at 1357*, I note that whether to

13 infer malice is a question of fact.  My findings in this regard

14 are that the Government lacked probable cause to seek

15 Plaintiff's indictment.  Again, the Government through its

16 agents failed to adequately investigate its allegations against

17 the Plaintiff.  The agents could have recognized the

18 insufficiency of their evidence and could have declined to

19 adopt the Government's statements before the grand jury.

20       The unsupported testimony that was provided to the

21 grand jury reflect an indifference to the Plaintiff's person

22 and his rights.  Consequently, I do infer legal malice.

23       Having found that the Plaintiff has met his burden of

24 proof on the four contested elements on his claim of malicious

25 prosecution as it pertains to the malicious commencement of the

1    prosecution in this case, I do not find it necessary to discuss

2    the evidence regarding the Government's conduct in continuing

3    that prosecution such as at subsequent detention hearings other

4    than the references I have already made to statements made at

5    the detention hearing.

6          What remains is for the parties to present testimony

7    and evidence regarding damages.  When would the parties like to

8    return for that?  You need some time to discuss this with your

9    clients?

10         MR. RAURELL:  Yes, Your Honor.

11         THE COURT:  Okay.  I'll take a 15-minute recess and

12   then you can let me know.

13         COURT SECURITY OFFICER:  All rise.

14      (A recess was taken from 10:59 a.m. to 11:25 a.m.)

15         COURT SECURITY OFFICER:  All rise.

16         THE COURT:  Please be seated.

17         I'll hear from the parties.

18         MR. HANNA:  Good afternoon, Judge.  I think there's --

19   we're not really on the -- the same page.

20         THE COURT:  Have you ever been?

21         MR. HANNA:  I think from Plaintiff's perspective, I

22   think 90 days would be plenty to allow Defendants to retain an

23   expert, depose our expert, we could depose their expert and

24   come back.  We're effectively talking about two witnesses in a

25   damages-only trial.  I'll let -- obviously, Defense counsel can

1    speak for themselves, but I think Defense -- Defendant's

2    perspective is they want six months, which we think is a little

3    excessive for two witnesses in a damages-only trial.

4            Ultimately, Your Honor, if we could perhaps have three

5    to four days and file written scheduling order for you, so that

6    way we could kind of look at -- go back to our respective

7    offices, look at our schedules and see what dates would work

8    specifically.  That might be helpful.  That's Plaintiff's

9    position.

10           THE COURT:  All right.  Thank you.

11           I'll hear from Defense.

12           MR. LEINICKE:  Good morning, Your Honor.

13   John Leinicke on behalf of the Government.

14           THE COURT:  Good morning.

15           MR. LEINICKE:  I think that the parties are -- have

16   some agreement, but it's not, not what we're ready for today.

17           Earlier in this trial, the Court suggested that if

18   this case did go to damages, the Court would be willing to

19   simply take it completely off docket again, re-stay -- enter a

20   new stay in the case, allow discovery to complete.  And then

21   specially set the damages portion of the trial when the parties

22   again had finally completed everything.  And that seems to me

23   to be the most intelligent of options available.

24           Just in terms of as the Government, you probably have

25   seen this before, but the procurement process for retaining an

1    expert is minimum of three to four weeks, and that's assuming

2    we selected an expert as we walk out of this courtroom.

3    Clearly, that's not going to happen.

4          So the Government's position is that the best tactic

5    would be three months is if everything works absolutely

6    perfectly, there's no problems, no one gets sick.  That's

7    highly unlikely.  Also, given that we're going into the summer,

8    and people's schedules significantly change.  But we do agree

9    that perhaps the best thing to do is for the parties to take a

10   breather, let everything sit for a minute and submit to the

11   Court a -- either a proposed scheduling order or competing

12   scheduling orders with -- by the end of this week.

13         THE COURT:  All right.  So --

14         MR. MITNIK:  Your Honor, I don't know if it's

15   appropriate for me to speak up to say one quick thing?

16         THE COURT:  Yes.

17         MR. MITNIK:  Okay.  Of course I want to say I'm sorry.

18   Thanks for letting me appear by phone.  I actually was on ten

19   minutes before, but we neglected to tell the courtroom

20   personnel I was on.  So I didn't want you to think I was late,

21   but it's our fault nonetheless we weren't on before.

22         But anyhow, my point of merit here is what I would

23   urge is that taking it off the docket in the middle of trial, I

24   would -- I would urge against.  And what I would further urge

25   is that if we could take maybe a trial date in July, which

1    gives us the full three months and rolls into July for the

2    trial.  And then let us go back and submit once we know the

3    parameters, then we can work around cutoff dates and those type

4    of things once we have some guidance.

5           My concern is just to go away for three or four days,

6    it's clear to me from our conversations that we're going to be

7    in the same boat in three or four days as far as the big

8    picture is concerned.

9           THE COURT:  So here -- thank you.

10          Here's what I'm going to tell the parties, and you can

11   give me your competing schedules, but these are the dates I'm

12   going to give you as options because I'm looking at my

13   calendar.  This needs to work for me as well.

14          How many days, first of all, do you all need for this

15   damages phase?

16          MR. LEINICKE:  The portion of the trial itself?

17          THE COURT:  Correct.

18          MR. LEINICKE:  I would anticipate about two, maybe one

19   but two.

20          THE COURT:  Well, first of all, I'm going to hear from

21   the Plaintiff whose testimony was truncated, right?

22          MR. LEINICKE:  Correct.  There will be -- so there

23   will be --

24          THE COURT:  Two competing experts and the Plaintiff.

25          MR. LEINICKE:  Correct.

1          MR. MITNIK:  Yes, Judge, that's the only -- yes,

2    Judge.  I would -- we have been talking about that, expecting

3    that -- not being presumptuous, but to be prepared.  And I

4    would think two days, three at the most.  But the only question

5    is we're going to have two damage experts, which sometimes can

6    be hard to anticipate.  However, my experience is with a damage

7    expert, they are typically not more on direct than a couple

8    hours, and even cross isn't more than an hour and there is

9    redirect.

10          So, and we only have to cover damages for our client,

11   so we do not have to reply back into more on the other issues.

12          So I'm hopeful in two days with given time, Mike's

13   thinking the most four but I'm thinking three at most, and I am

14   in total agreement with our own side.

15          MR. LEINICKE:  If I may ask a question, Your Honor?

16          THE COURT:  Yes.

17          MR. LEINICKE:  On the issue of closing arguments for

18   damages, does the Court anticipate permitting or requesting

19   oral argument or if -- or would it be best for the parties to

20   submit written, their written damages submissions?  That as

21   well would significantly truncate in Court time.

22          THE COURT:  I leave it up to you whether you want to

23   give me proposed findings on damages or not.  I'm not requiring

24   that.

25          MR. MITNIK:  I would not.  I would rather give them

1    orally, but I would not think it's going to take more than an

2    hour on damages alone per side.

3           THE COURT:  Right.  But if the Defendant wants to

4    submit written proposed findings on damages, it may do so.

5           MR. MITNIK:  Well, I'm not -- understand that.  I

6    don't mean to stop you, but I was just stating my request that

7    we would like to do it orally.

8           THE COURT:  All right.  So I'm going to give you

9    August 21st through the 23rd, that's three days on the

10   calendar.  And if not that, then it would be September 3rd --

11   it would be a September 3rd start date for the next three days

12   or four on that week, on the calendar.  I'm giving you the

13   second week of my trial calendars because I'm leaving the first

14   week for any jury trials I might have.

15          So those are your two options.

16          MR. MITNIK:  Okay.  I'm just looking at something real

17   fast.  I'll let someone else talk, I'll be quiet.

18          MR. HANNA:  While he's looking, Judge, if I may for a

19   second, how would that even -- if Defendants are going to be

20   presenting written closing, how would we get the -- an

21   opportunity to provide rebuttal closing arguments?  I mean,

22   they are going to have it ready to go and they're just going

23   to read --

24          THE COURT:  No, I mean, I'm not going to read it, have

25   you sit there watching me read it.  I assume they would file it

1   at some point and have it ready to submit maybe a day or two

2   before closing --

3          MR. HANNA:  Okay.

4          THE COURT:  -- or even before the trial starts and

5   give me their perspective.  I don't know.

6          MR. HANNA:  Got it.

7          THE COURT:  I'm just saying if you all want to give me

8   something in writing, you may.

9          MR. HANNA:  Got it.

10          THE COURT:  But you don't have to.

11          Those are the two options.  That gives the Government

12   ample time to follow the procurement process and get somebody

13   if you think that's warranted.

14          I, frankly, you know, this battle of the experts and

15   talking and telling me about the deleterious effects of being

16   in solitary confinement, I don't know that it's that helpful or

17   that necessary to me.  But if you want to give that to me, I'll

18   consider it for what it's worth.

19          Again, my role as gatekeeper here is very different.

20   By the same token, I'm also very much aware of different laws

21   that compensate wrongfully convicted Defendants, right?  And

22   who spend years and years in prison.  And I'm very much aware

23   of that law and how society has seen fit to compensate for

24   wrongful detention, and what's a measure for wrongful

25   detention.  The difference here is that we're talking solitary.

Proceedings
March 19, 2024
Irfan Kahn v. United States of America, 13-cv-24366-CMA

1          I don't know if that helps you all as you go forward

2     and move toward a damages phase of the case.  I know that

3     Plaintiff made some reference early on to an extremely large

4     number.

5          Is there anything else?

6          MR. MITNIK:  No, ma'am.

7          MR. LEINICKE:  The Court -- did the Court ask the

8     parties to submit a scheduling order, Your Honor?

9          THE COURT:  Give me your pick, pick the August date or

10    the September date, that's what you've got.

11         MR. LEINICKE:  Okay.

12         THE COURT:  Right?  If you have any discovery issues,

13    you take those to the magistrate judge.

14         And I am not allowing you to be filing more motions in

15    this regard because what remains is an evidentiary issue.

16    There are no motions *in limine*, there are no *Daubert* motions.

17    And I would hope that at this point, after some 11 years

18    litigating this case, and here we are nearing the end, if you

19    could try to reach agreement on what remains for your

20    presentation at the end.

21         Anything else?

22         MR. LEINICKE:  The deadline for that submission is

23    this Friday?

24         THE COURT:  This Friday.

25         MR. LEINICKE:  Thank you, Your Honor.

```
 1              No further questions from the Government.

 2          MR. HANNA:  Thank you, Your Honor.

 3          THE COURT:  Thank you.

 4          MR. MITNIK:  Thank you.

 5          COURT SECURITY OFFICER:  All rise.

 6          THE COURT:  Thank you.  You all have a good day.

 7          MR. LEINICKE:  You too.

 8       (The proceedings adjourned at 11:36 a.m.)

 9


10                    C E R T I F I C A T E

11

12      I hereby certify that the foregoing is an

13   accurate transcription of the proceedings in the

14   above-entitled matter.

15

16

17   _04/14/2024_      STEPHANIE A. McCARN, RPR
         DATE          Official United States Court Reporter
18                     400 North Miami Avenue, 13th Floor
                       Miami, Florida 33128
19                     (305) 523-5518

20

21

22

23

24

25
```