## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 13-24366-CIV-ALTONAGA/Reid

**IRFAN KHAN**,

      Plaintiff,

v.

**UNITED STATES OF AMERICA**,

      Defendant.

_____/

### <u>ORDER</u>

**THIS CAUSE** came before the Court on a three-day non-jury trial limited to the issue of

damages.  (*See* Minute Entries [ECF Nos. 385–87]).  The Court previously concluded the

Government is liable for maliciously prosecuting Plaintiff.  (*See generally* Mar. 13, 2024 Tr. [ECF

No. 371]).  The Court has carefully considered the witnesses' testimony, the exhibits admitted in

evidence, the parties' written submissions,[1] and applicable law.  Based on a review of the record

and pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following additional

findings of fact and conclusions of law.

### I.  FINDINGS OF FACT

The Court makes the following findings of fact:

1.  Plaintiff, a Pakistani who came to the United States as a young man, is a South Florida

resident and taxi driver.  He was arrested on May 14, 2011, at a Los Angeles hotel he was staying

at while working a temporary information technology job for a staffing company in the city.  He

had been working in the information technology field for approximately three months, after

---

[1] The parties each submitted Proposed Findings of Fact and Conclusions of Law.  (*See generally* United States' Supplemental Proposed Findings of Fact and Conclusions of Law ("Gov't's Proposal") [ECF No. 390]; Plaintiff's Proposed Revised Findings of Fact and Conclusions of Law for Damages ("Pl.'s Proposal") [ECF No. 391]).

completing coursework in information technology to better himself.   At 3:00 a.m., he was awakened by a call from the Government instructing him to open the door.   When he did so, he was surrounded by around 20 agents with guns drawn and was placed on the ground while law enforcement searched his room.   At the time of the arrest, he had been asleep and was not dressed; the arrest so terrified him that he urinated on himself.

2.   Plaintiff came to learn that the Government charged him with providing material support to a conspiracy to murder, kidnap, and maim persons overseas and with providing material support to a terrorist organization, the Pakistani Taliban.   He also came to learn that he was facing a potential sentence of 360 months to life in prison.

3.   After his arrest, Plaintiff was detained at several facilities and subjected to visual body cavity searches; Plaintiff had never been naked in front of another man, and these searches traumatized him.   Eventually, he was transported by air from the Metropolitan Detention Center in Los Angeles to a federal detention center in Oklahoma; and then to the Federal Detention Center in Miami, Florida, where he remained in administrative segregation, or solitary confinement, in a Special Housing Unit (SHU).   During his incarceration in Los Angeles and Oklahoma, Plaintiff was not allowed to contact non-attorneys, such as his wife or family.

4.   While in the SHU, Plaintiff had no cellmates, had limited facilities, and had little access to outside news or information.   The conditions were trying, with cold temperatures that made sleeping difficult, constant noise, smells of urine and feces, and virtually no access to the outdoors. Plaintiff was required to change cells every two weeks; some of the new cells had feces around the toilets that had not been cleaned before he was placed there.   Plaintiff lost approximately 50 pounds while in solitary confinement; often there was not enough food to eat.

5.  Plaintiff was held near his father and brother but did not interact with them, except for when, on occasion, he assisted with his father's visual body cavity searches.  Plaintiff himself was subjected to approximately 159 visual body cavity searches, which required undressing completely in front of prison officials.

6.  Over time, Plaintiff was able to have regular visits with his wife, two children, and other non-incarcerated family members.  Plaintiff was also permitted to visit a "law library" — an empty cell with a computer and no bathroom — and a Sensitive Compartmented Information Facility ("SCIF"), for review of classified documents.  During visits to the SCIF, he remained shackled.  If he needed to use the restroom, he would be removed from the "law library" and not permitted to re-enter; he often chose to skip meals so he would not need to use the restroom while in the "law library."  He also declined to use the empty cell he was offered as a place to exercise one or two times a week, as it lacked any exercise equipment or a restroom.

7.  Plaintiff's mental health deteriorated considerably during his confinement.  He suffered from delusional thoughts, spent hours in isolation without any human companionship or forms of distraction, and complained to his guards of psychological torture.  He did not receive any treatment or medical care.

8.  After 317 days, Plaintiff was released, and the charges against him were dropped.  Because the charges were dropped without prejudice, however, Plaintiff spent several years fearing that the Government would reinstate the charges.

9.  Since his release, Plaintiff has experienced symptoms of post-traumatic stress disorder and developed obsessive tendencies.  He fears being rearrested and fears being pulled over for a simple traffic infraction; he struggles with normal activities, like making friends and taking flights which involve hours to clear airport security.  He also worries about the impact of his experience

3

on his reputation and potential relationships with others.  An expert witness, Dr. Stuart Grassian, testified that solitary confinement often causes these conditions and concluded Plaintiff is likely to be suffering a permanent form of PTSD.  Although another expert witness, Dr. Ryan Hall, cast doubt on portions of Dr. Grassian's findings, the Court concludes Dr. Grassian's conclusions are credible and aligned with other evidence in the record.

10.   At the time of his arrest, Plaintiff worked in information technology; the job paid $39.20 per hour.  He has not regained that, or comparable, employment.  After his release, Plaintiff worked briefly as a real estate agent and for the law firm that represented his father.  He has struggled to find employment beyond driving a cab.

11.   In the years since his prosecution and detention ended, Plaintiff has remained married to his wife, and they have had two more children.  Plaintiff has returned to many of the same activities he engaged in before his incarceration, including playing cricket, fishing, and attending religious services.  He engages in the normal activities of daily living, including cooking, cleaning, shopping, and maintaining his residence with his wife and children.

12.   Plaintiff's arrest, prosecution, and confinement were publicized and are now associated with him.  Much of this information, including his Indictment, is still publicly available online.

## II.  LEGAL STANDARD

"The components and measure of damages in [Federal Tort Claims Act] claims are taken from the law of the state where the tort occurred[.]" *Bravo v. United States*, 532 F.3d 1154, 1160–61 (11th Cir. 2008) (alteration adopted; other alterations added; quotation marks and citation omitted).  "It has long been accepted in Florida that a party claiming economic losses must produce evidence justifying a definite amount." *United Auto. Ins. Co. v. Colon*, 990 So. 2d 1246, 1248 (Fla. 4th DCA 2008) (citations omitted).  "Although uncertainty as to the amount of damages, or

difficulty in proving the exact amount, will not preclude recovery, there must be some reasonable basis in the evidence to support the amount awarded." *Smith v. Austin Dev. Co.*, 538 So. 2d 128, 129 (Fla. 2nd DCA 1989) (citations omitted).

"Economic damages may not be founded on [] speculation or guesswork and must rest on some reasonable factual basis." *Colon*, 990 So. 2d at 1248 (alteration added; citation omitted). "Plaintiff has the burden of presenting evidence justifying a specific and definite amount of economic damages." *Id.* (citation omitted). Furthermore, "[u]nder Florida law[,] an award of non-economic damages must bear a reasonable relation to the philosophy and general trend of prior decisions in such cases." *Bravo*, 532 F.3d at 1162 (alterations added; quotation marks and citations omitted).

### III.  CONCLUSIONS OF LAW

The Court addresses two legal arguments raised by the Government, outlines its approach to determining damages, and concludes by calculating and awarding damages.

#### A.  The Government's Legal Arguments

During its closing argument, the Government raised — for the first time — two legal arguments it contends bar certain categories of damages.  First, the Government argues it cannot be liable for damages occurring after Plaintiff's detention hearing because the actions "causing" Plaintiff's detention after that date are shielded by prosecutorial immunity.  (*See* Gov't's Proposal 23–25).  Second, the Government argues it cannot be liable for reputational damages because it has not waived its immunity for libel or slander.  (*See id.* 21–23).  The Court considers both arguments in turn, concluding no categorical bars are warranted.

***Prosecutorial immunity.***  According to the Government, Plaintiff cannot recover damages stemming from any injury arising after his detention hearing.  (*See id.* 23–25).  Any continued

detention after that hearing, the Government's theory goes, was "caused" by the prosecutors who advocated for Plaintiff's detention at the hearing, not the agents the Court previously found liable for maliciously prosecuting Plaintiff. (*See id.*). Not so.

First, as a legal matter, the argument is unpersuasive. In Florida, "liability for the arrest *and confinement* caused by the malicious institution of criminal proceedings is part of the damages resulting from malicious prosecution[.]" *Jackson v. Navarro*, 665 So. 2d 340, 342 (Fla. 4th DCA 1995) (alteration and emphasis added; citation omitted). Indeed, Florida law recognizes that malicious prosecution will — in and through the course of intervening legal proceedings — result in confinement. *See id.* For example, Florida courts do not allow a plaintiff to recover for a claim of false imprisonment resulting from a malicious prosecution because the imprisonment in such a case is technically lawful and thus not false. *See id.* To the extent such an imprisonment is unjustified, Florida courts instruct that the resulting injury should instead "be remedied in a malicious prosecution action[.]" *Id.* (alteration added). In other words, Florida law expressly contemplates plaintiffs may recover damages for confinement resulting from a malicious prosecution through a claim for just that: malicious prosecution. *See id.*

Second, even if the Government were correct as a legal matter, its argument runs aground factually. During the liability phase of proceedings, the Court found that, "[a]t a detention hearing, an[] FBI special agent largely reiterated the Government's case as it had been presented to the grand jury" and, additionally testified that Plaintiff's relative, to whom Plaintiff had sent money, "was a Taliban commander." (Mar. 13, 2024 Tr. 7:19–23; *see also id.* 24:4–5 (noting that, "[a]t the pretrial detention hearing, the Government *through its agent*" made an assertion contradicted by the record (alteration and emphasis added))). Thus, the Court concluded "[t]he agents were legal causes of Plaintiff's prosecution *and* subsequent detention." (*Id.* 13:19–20 (alteration and

6

emphasis added); *see also id.* 12:25–13:2 ("The record here shows that agents testified in support of grand jury testimony *and detention*, and that they were active investigators before *and after* the process." (alterations and emphases added))).   The Government may not relitigate this finding now.   *See Cambridge Univ. Press v. Albert*, 906 F.3d 1290, 1299 (11th Cir. 2018) ("The doctrine of the law of the case precludes courts from revisiting issues that were already decided." (alterations adopted; quotation marks and citation omitted)).

In short, the Court sees no reason to bar damages flowing from Plaintiff's continued detention after his detention hearing.

***Reputational harm.***  Next, the Government argues it has not waived its immunity as to any defamation claims against it, and Plaintiff therefore cannot recover any damages flowing from reputational harm.  (*See* Gov't's Proposal 21–23).   The Government's argument is not persuasive as a matter of law.

Admittedly, the FTCA does not permit recovery for claims involving defamation, libel, or slander.   *See O'Ferrell v. United States*, 968 F. Supp. 1519, 1527–29 (M.D. Ala. 1997).   It mischaracterizes the record, however, to insist that Plaintiff's "claim for reputational harm arose from 'libel, slander, misrepresentation, or deceit.'" (Gov't's Proposal 23).   Plaintiff testified about the effect of the Government's press releases, but he did not seek to prove the specific elements of the torts of defamation, libel, or slander.   Instead, he sought to introduce evidence of reputational harm associated with his prosecution and confinement more generally.   As explained below, the Court has some doubts as to whether Plaintiff successfully introduced sufficient evidence to support his claim for reputational damages.   But Plaintiff was certainly entitled to try do so as an extension of his malicious prosecution claim.

"Malicious prosecution as an action at common law was to protect the individual from unjustifiable litigation in the protection of the interests of [] *damage to reputation*[,]" among other things. *Cate v. Oldham*, 450 So. 2d 224, 227 (Fla. 1984) (alterations and emphasis added; citation and other emphasis omitted). As the Florida Supreme Court has stated, "[m]alicious prosecution is considered a personal tort[,]" and "[t]he gravamen of the action is injury to character." *Id.* (alterations added; citations omitted).

Unsurprisingly, Florida courts have recognized the relevance of malicious prosecution to remedying reputational harm. *See, e.g.*, *Tackett Plastics, Inc. v. Bowsmith, Inc.*, 614 So. 2d 30, 31 (Fla. 2nd DCA 1993) (reversing summary judgment on a malicious prosecution claim where the plaintiff allegedly "suffered damages resulting from harm to reputation" (alteration adopted; quotation marks omitted)); *Turkey Creek, Inc. v. Londono*, 567 So. 2d 943, 948 (Fla. 1st DCA 1990) (permitting plaintiffs to seek "damages which could not have been recovered in [another] action, such as compensation for harm to reputation" (alteration added)), *aff'd*, *Londono v. Turkey Creek, Inc.*, 609 So. 2d 14, 17 (Fla. 1992); *Pledger v. Burnup & Sims*, 432 So. 2d 1323, 1328 (Fla. 4th DCA 1983) (explaining that, although a defamation action cannot be instituted based on "statements made in the course of a judicial proceeding," a party may still be able to seek redress "by an action in malicious prosecution").

Similarly, as Plaintiff points out (*see* Pl.'s Proposal 21), at least one federal court in this Circuit has also concluded that "injury to [] reputation" is a "legitimate ground[] for monetary relief in an action for malicious prosecution." *Ware v. United States*, 971 F. Supp. 1442, 1471 (M.D. Fla. 1997) (alterations added; citing *S.H. Kress & Co. v. Powell*, 132 Fla. 471 (1938)). The

Court is thus persuaded Plaintiff may recover damages for reputational harm without bringing a defamation claim.[2]

### B. The Court's Approach

The parties cite several cases and ask the Court to either take notice of or disregard various similarities and dissimilarities between those cases and the facts of this case. At trial, in a Notice of Supplemental Authority, and in his Proposal, Plaintiff relies heavily on a series of settlements and jury verdicts to calculate the damages he claims he is owed. (*See, e.g.*, Pl.'s Proposal 37–50; Notice of Suppl. Authority . . . [ECF No. 384]). For the most part, these cases have little to no bearing on the Court's inquiry.

As explained, the Court's focus is on "the philosophy and general trend of prior decisions in such cases." *Bravo*, 532 F.3d at 1162 (quotation marks and citations omitted). In making this determination, the Court may not look to just *any* award or judgment. For the purposes of this assessment, the Eleventh Circuit "restrict[s] . . . [its] consideration to reported appellate decisions in which awards were tested for size[.]" *Id.* at 1166 (alterations added; quotation marks omitted). The undersigned agrees with another Court in this District that this limitation doubles as instruction for courts fashioning damages awards. *See Dixon v. United States*, No. 15-23502-Civ, 2017 WL 1541391, at *32 (S.D. Fla. Apr. 28, 2017) (following *Bravo* and stating that "courts must look to judgments that have been upheld on appeal by the Florida appellate court that would have had jurisdiction over an appeal in the case had it been filed in state court" (citing *Bravo*, 532 F.3d at

---

[2] The Government states, without legal citation, that "any damages based on reputational harm not arising out of libel, slander, misrepresentation, or deceit . . . must be measured against the reputation [Plaintiff] would have suffered regardless, due to his father's conviction of terrorism and his knowledge of, if not involvement in, that crime." (Gov't Proposal 23 n.9 (alterations added)). The Government's attempt to undermine the Court's findings is not well taken. (*See, e.g.*, Mar. 13, 2024 Tr. 21–25 (concluding there was no probable cause for the Government's assertions that Plaintiff participated in a criminal conspiracy to fund the Pakistani Taliban)). Nor does the Court understand what, exactly, the Government proposes should be done with this otherwise unsupported assertion.

1164)), *partially rev'd on other grounds*, 900 F.3d 1257, 1261 (11th Cir. 2018) (noting that "the total amount of damages" was not on appeal).  In the absence of such authority, the Court also considers cases from other jurisdictions.  *See Dixon*, 2017 WL 1541391, at *32.

When applying Florida law, the Eleventh Circuit follows this approach because it is the one followed by Florida courts, including the appellate court that would have jurisdiction over Plaintiff's case here.  *See Bravo*, 532 F.3d at 1165–66.  This approach "makes sense" because the courts are instructed to assesses the philosophy and trend of awards "on a statewide basis, not on the basis of varied trial court decisions."  *Id.* at 1166.  Further, given the "number of reasons that a verdict or award entered at the trial stage may not realistically reflect what is actually going on in the world of damage awards[,]" the Eleventh Circuit concluded "[i]t cannot be" that potentially excessive, unreviewed awards could set the standard for damages.  *Id.* at 1166–67 (alterations added).

Similarly, the Eleventh Circuit has cautioned courts against relying on settlements as guidance for awarding damages.  "Because of the multiple factors that must be taken into account when making settlement decisions, and because predicting the result of trials is not an exact science by any means, the settlement figure will rarely match what a trial would have determined to be actual damages owed the plaintiff by the settling defendant."  *Murphy v. Fla. Keys Elec. Co-op*

*Ass'n, Inc.*, 329 F.3d 1311, 1315 n.5 (11th Cir. 2003) (citations omitted).[3]  Certainly, courts around the country have not found settlements comparable to post-trial judgments.[4]

Plaintiff insists the Court can disregard this instruction because there are so few cases with similar facts.  (*See* Pl.'s Proposal 26–28).  He urges the Court to take up the position of the dissent in *Bravo* — which is, of course, not binding — and evaluate all settlements and jury awards.  (*See id.* 27).  And he cites to law reiterating the true, if irrelevant, proposition that similar awards are instructive but not dispositive.  (*See id.* 28).

As explained, however, there are concrete and compelling reasons to avoid using settlements and unreviewed jury awards as comparators for fashioning a damages award.  Moreover, as will be explained, the Court is satisfied there are comparable cases providing, if not identical facts, then at least guidance on the range of reasonable damages awards for cases such as Plaintiff's.  Thus, the Court has considered but does not use Plaintiff's many comparisons to

---

[3] Plaintiff recognizes the unreliability of using settlements as the basis for damages awards but seems to argue this unreliability arises because settlements are often less generous than damages awards.  (*See* Pl.'s Proposal 39–40 n.28 (arguing that "settlements are not reliable for creating a ceiling for valuation" but are, nonetheless, appropriate comparators to create a floor for valuations")).  In fact, the Supreme Court has "recognize[d] that settlements frequently result in the plaintiff's getting *more* than he would have been entitled to at trial." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 219 (1994) (alteration and emphasis added).  In any event, as the Government pointed out at trial, the settlements referenced here arose from significantly different factual circumstances as compared to each other, much less Plaintiff's case.  And the impossible task of discerning *which* factual differences drove the ultimate settlement figure only underscores the impracticability of using a settlement to bluntly calculate damages.

[4] *See, e.g.*, *McDermott*, 511 U.S. at 219–20 ("Because settlement amounts are based on rough estimates of liability, anticipated savings in litigation costs, and a host of other factors, they will rarely match exactly the amounts a trier of fact would have set."); *Newton v. City of N.Y.*, 171 F. Supp. 3d 156, 172 n.98 (S.D.N.Y. 2016) ("This Opinion does not, however, consider settlement awards . . . because settlement values, by definition, implicate compromise and therefore cannot be compared with jury verdicts." (alterations adopted; other alteration added; citations omitted)); *Kasongo v. United States*, 523 F. Supp. 2d 759, 804 n.39 (N.D. Ill. 2007) (noting that comparisons between settlements and damages are "less useful" because "the amount settled for may bear little relation to the amount a jury might award"); *Cedeno v. Broan-Nutone, LLC*, No. 16-cv-796, 2019 WL 4751913, at *8 n.13 (E.D.N.Y. Sept. 30, 2019) ("Because settlement figures may take into account factors other than reasonable compensation, the court does not find the settlement figures submitted by the parties to be instructive in fashioning an appropriate damages award." (citation omitted)).

settlements and unreviewed jury awards when determining an appropriate damages award in this case, where a full trial has been conducted and record evidence must form the basis of any award.

To be sure, even reviewed jury awards offer imprecise guidance here. Juries are not necessarily tasked with itemizing damages and are not required to calculate damages precisely. *See United States v. Sullivan*, 1 F.3d 1191, 1196 (11th Cir. 1993). In the absence of a detailed explanation, it is difficult to discern with any confidence which facts drove their awards and in what ways. *See id.* (noting that a jury's calculation need only be supported by "a rational basis"). Thus, the Court will not rely on the generalized comparison of facts and figures; instead, the Court focuses on identifying relevant similarities and considering, as guidance, the range of awards that have been approved by courts on the basis of those similarities.

### C. Damages

With that, the Court identifies bases for damages and discusses each in turn: (1) wrongful imprisonment; (2) solitary confinement; (3) lost profits; and (4) non-economic damages.

***Wrongful imprisonment.*** Because Plaintiff was maliciously prosecuted, it follows that he must be compensated for the 317 days during which the Government detained him. The parties direct the Court's attention to cases awarding a wide range of damages for similar instances of wrongful imprisonment. (*See* Pl.'s Proposal 27, 41–42; Gov't's Proposed 14–15).[5] These cases

---

[5] Collectively citing *Winn-Dixie Stores, Inc. v. Robinson*, 472 So. 2d 722, 723–26 (Fla. 1985) (reinstating $200,000 award of compensatory damages for brief imprisonment after malicious prosecution); *City of Miami v. Swift*, 481 So. 2d 26, 26–27 (Fla. 3rd DCA 1985) (upholding $50,000 award for one hour of unjustified detention); *Limone v. United States*, 579 F.3d 79, 104 (1st Cir. 2009) (upholding an award using a baseline of $1,000,000 per year of wrongful incarceration); *Crews v. Cnty. of Nassau*, 149 F. Supp. 3d 287, 297–99 (E.D.N.Y. 2015) (declining additur for a $175,000 award of compensatory damages for 125 days of wrongful incarceration after malicious prosecution); *Slevin v. Bd. of Comm'rs for Doña Ana*, 934 F. Supp. 2d 1270, 1274–75 (D.N.M. 2012) (upholding $15 million award of compensatory damages for two years of unjustified administrative segregation); *Kinge v. State*, 915 N.Y.S.2d 186, 193 (N.Y. Sup. Ct. 2010) (upholding $250,000 damages award for two-and-a-half years of wrongful incarceration after malicious prosecution).

are of limited utility, however, as they incorporate a wide range of non-economic damages that the Court awards separately.[6]

Instead, as the Court and the Government noted at trial, compensation for a year of wrongful incarceration has been capped at $50,000 by both federal and Florida statutes. *See* 28 U.S.C. § 2513(e); Fla. Stat. §§ 961.06(1)(a); *id.* at 961.01–.07; (*see also* Gov't's Proposal 18–19). Plaintiff emphasizes, correctly, that those statutes are not binding here. (*See* Pl.'s Proposal 30–31); *see also Limone*, 579 F.3d at 105 (declining to limit damages award in light of federal and state damages caps).

Nonetheless, given the scarcity of cases itemizing damages awards, and the lack of cases with directly analogous facts, the Court agrees that $50,000 per year of wrongful incarceration serves as an appropriate baseline for awarding damages. Pro-rated across Plaintiff's 317 days in confinement, the Court thus awards $43,424.66 for Plaintiff's wrongful imprisonment alone. (*Cf. Douglas v. United States*, No. 09-cv-02145, J. [ECF No. 83] filed June 28, 2011 (M.D. Fla. 2013) (pro-rating damages award for wrongful incarceration based on $50,000 damages cap)).

**Solitary confinement.** The Government asks the Court to stop its analysis here. (*See* Gov't's Proposal 1 (arguing that "this case does *not* require any departure from the laws compensating wrongfully incarcerated individuals" (emphasis in original))). But Plaintiff was not

---

[6] *See Swift*, 581 So. 2d at 27 (noting that the verdict was not excessive "in light of the testimony that the plaintiff was incarcerated, subjected to a strip search and the charge . . . continues on the computers . . . with no notation that the charges were dismissed" (alterations added)); *Limone*, 579 F.3d at 106 (noting that the awarded damages were "high enough to be troubling" but not "*grossly* disproportionate" in light of "the severe emotional trauma inflicted" (emphasis in original)); *Crews*, 149 F. Supp. 3d at 298 (explaining that "courts do not analyze damages awards by assigning a dollar value to a unit of time as the starting point" but instead "consider[] all of the relevant factual circumstances" (alteration added)); *Slevin*, 934 F. Supp. 2d at 1274 (upholding award because "deference to the jury's determination is most appropriate" where, as in that case, "the jury has been asked to place a monetary value on Plaintiff's experience of non-economic harm" (citation omitted)); *Kinge*, 915 N.Y.S.2d at 193 (concluding that the damages award was supported by "all of the circumstances, including the emotional and mental harm incurred by [the] claimant" (alteration added)).

merely wrongfully incarcerated, nor do all his injuries flow solely from the fact of his incarceration.  It would be unreasonable to ignore any further basis for damages here.

To begin, Plaintiff's time was spent in the SHU, which can itself serve as a separate source of damages.[7]  For example, in *McClary v. Coughlin*, an incarcerated person — whose incarceration was not challenged — was awarded $660,000 by a jury for "four, uninterrupted years in SHU solitary confinement[.]"  87 F. Supp. 2d 205, 218 (W.D.N.Y. 2000) (alteration added); *see id.* at 207.  In reviewing the award, the court concluded the award's "per diem equivalent of almost $500 per day" was excessive in light of similar cases awarding $100 to $150 per day of "improper . . . placement in SHU."  *Id.* at 218 (collecting cases).  The award was remitted to "the per diem equivalent of [] approximately $175 per day[.]"  *Id.* at 219 n.10 (alterations added).

On the other end of the spectrum in a reported case, the Eighth Circuit affirmed a verdict of $2,000 per day for a "sufficiently egregious" case of "unconstitutional solitary confinement[.]" *Simmons v. Cook*, 154 F.3d 805, 809 (8th Cir. 1998) (alteration added; footnote call number omitted).  In that case, two incarcerated persons were placed in solitary confinement with no consideration for their disabilities and deprived of basic needs like food and sanitation.  *See id.* at 806–07.

Here, Plaintiff certainly suffered in the SHU.  Despite the Government's statements to the contrary, the Court is not persuaded that his conditions of confinement were so routine as not to constitute solitary confinement; nor is the Court persuaded that occasional travel for legal matters and visits to the SCIF lead to the conclusion that Plaintiff was not in solitary confinement or the SHU for the length of his detention.  (*See* Gov't's Proposal 20–21).  Even assuming Plaintiff's

---

[7] Plaintiff convincingly established, at trial and in his Proposal, that his time in the SHU caused additional injury and justifies additional damages.  (*See* Pl.'s Proposal 32–36).  But he offered neither expert testimony nor any established methodology with which to quantify that injury; again, the cases he cites are of limited comparative value.  (*See, e.g., id.* 32–42 (relying on settlements and unreviewed jury awards)).

time in the SHU abided by typical procedures for such confinement, and the conditions of confinement were not unconstitutionally deficient, it must be remembered that any confinement of Plaintiff — much less his time in the SHU — was unjustified.  Nonetheless, the Court is not persuaded the conditions of Plaintiff's confinement justify a $2,000 per day award like that in *Simmons*.

Considering the whole of admissible evidence presented at trial, the applicable law, and inflation since the awards recounted in *McClary*, the Court awards $500 for each day of Plaintiff's confinement in the SHU (and before that in Los Angeles and Oklahoma): 317 days in all.  Thus, the Court awards an additional $158,500.00 in damages.

***Lost profits.***  At trial, Plaintiff sought to introduce evidence of lost profits, pointing to his employment at the time of his arrest and his inability to regain similar employment since his release.  Much of this evidence was hearsay, and the Government contested whether Plaintiff — even at the time of his arrest — had a reasonable expectation of continued employment.  Considering the testimony and evidence, the Court is not persuaded that Plaintiff would certainly be earning a similar amount today or that his projected earnings were sufficiently established.  *See Miami-Dade Cnty. v. Cardoso*, 963 So. 2d 825, 827 (Fla. 3d DCA 2007) (explaining that future economic damages must be "established with reasonable certainty" (quotation marks, citation and emphasis omitted)).

Still, based upon the whole of admissible evidence presented at trial and the applicable law, the Court is persuaded that Plaintiff could have been earning $39.20 per hour, 40 hours per week, for at least the period of his confinement.  Thus, the Court awards $71,008.00 in damages for Plaintiff's lost profits.

***Non-economic damages.***  Finally, Plaintiff seeks damages for the emotional distress and reputational harm caused by his prosecution and confinement.  In making this award, the Court has significant discretion.  *See Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338, 1344–45 (11th Cir. 2005).  "A plaintiff may be compensated for intangible, psychological injuries as well as financial, property, or physical harms."  *Id.* at 1345 (citation omitted).  While damages "may be inferred from the circumstances[,]" a plaintiff must still show his or her injury "by competent, sufficient evidence."  *Id.* (alteration added; quotation marks and citation omitted).

Here, Plaintiff testified at length about his emotional suffering, explaining in detail how his arrest, prosecution, and detention caused and continue to cause him emotional distress.  Plaintiff also called an expert, who outlined in compelling and credible fashion how solitary confinement affects mental health and causes post-traumatic stress disorder.  But neither Plaintiff nor his expert testified as to how this emotional distress should be compensated.  Similarly, while the Government called a rebuttal witness solely to undermine Plaintiff's expert, it declined to offer its own approximation of any damages owed to Plaintiff.

The Court is persuaded Plaintiff has established — with "competent, sufficient evidence" — that he suffered and continues to suffer emotional distress.  *Akouri*, 408 F.3d at 1345.  The record is replete with references to the unique distress Plaintiff endured because of his experience.  At trial, Plaintiff testified credibly that — in addition to the obvious trauma of his wrongful incarceration and solitary confinement — over the past ten years, his behavior and relationships have continued to be significantly impacted.  Additionally, Plaintiff testified that he continues to alter his behavior in fear and anticipation of another similar experience.  Plaintiff further noted the impact of the Government's dismissal of the charges against him without prejudice, as well as the

Government's decision to maintain that he was guilty of a crime during the liability phase of this trial.  This warrants additional compensation.

The record is less clear on whether Plaintiff suffered reputational harm.  At trial, much of the evidence Plaintiff sought to introduce on this point was hearsay, admitted only — if at all — to show its effect on him.  He offered no concrete evidence of reputational harm nor any expert testimony on how to compensate for this type of harm.  Nonetheless, the Court is satisfied that Plaintiff has adequately established a measure of emotional distress arising from his concerns about reputational harm — concerns that are not unfounded, given the tort of malicious prosecution intrinsically contemplates reputational harm.  *See Cate*, 450 So. 2d at 227.

Because the undersigned finds Plaintiff has been injured, the question then becomes how to compensate Plaintiff for this injury.  Plaintiff urges the Court to again calculate damages using some kind of multiplier, based on days in confinement or the number of strip searches performed. (*See, e.g.*, Pl.'s Proposal 37–50).  The Court is not convinced to take this approach for non-economic damages.  Certainly, the Court may infer that Plaintiff's extended confinement, the repeated strip searches he endured, and the time during which he waited for the statute of limitations to expire caused him additional emotional distress.  (*See* Pl.'s Proposal 43 (citing *Blackburn v. Snow*, 771 F.2d 556, 573 (1st Cir. 1985) (considering repeated strip searches to be a basis for "correspondingly higher damage awards"))).

Yet, the Court is not persuaded that it is necessary, or appropriate, to use existing awards to calculate damages by simply using another jury award to extrapolate a per diem or per strip search figure.  Jury awards are both made and reviewed as total figures that factor in the facts of the case and many potential bases for damages combined.  *See, e.g.*, *Blackburn*, 771 F.2d at 573 (describing several reasons that a damages award for repeated strip searches might be higher).

Moreover, as time goes by, jury awards become less useful in helping to understand the "general trend" of similar cases. *Bravo*, 532 F.3d at 1162. Thus, the Court focuses its attention on four cases, each relatively recent and involving a jury award that was reviewed and either affirmed or remitted. From these cases, the Court derives guidance in shaping Plaintiff's non-economic damages award, but not any hard or fast per diem calculation.

*Kinge.* First, the Government calls the Court's attention to *Kinge v. State*. (*See* Gov't's Proposal 14 (citing *Kinge v. State*, 915 N.Y.S.2d 186, 193 (N.Y. Sup. Ct. 2010))). In that case, the plaintiff was prosecuted and incarcerated for two-and-a-half years for a crime she did not commit. *See Kinge*, 915 N.Y.S.2d at 193. It was later revealed that the investigator in the case had fabricated evidence and committed perjury to obtain the plaintiff's conviction. *See id.* at 188. After a bench trial, a court found the defendant liable for negligent supervision and malicious prosecution and awarded the plaintiff $250,000 in compensatory damages. *See id.* at 188–89. The court "based its damages award on the mental anguish and emotional distress" resulting from the experience, "as well as [the plaintiff's] loss of liberty while incarcerated[.]" *Id.* at 193 (alterations added). The court declined, however, to award damages "for damage to reputation and character." *Id.* An appellate court determined that the award, which the plaintiff appealed, "d[id] not deviate materially from what is reasonable compensation[.]" *Id.* (alterations added; citation omitted).

*Slevin.* Next, Plaintiff directs the Court to *Slevin v. Board of Commissioners for County of Doña Ana*. (*See* Pl.'s Proposal 41–42 (citing *Slevin v. Bd. of Comm'rs for Doña Ana*, 934 F. Supp. 2d 1270, 1273–80 (D.N.M. 2012))). In that case, the plaintiff was arrested and kept in administrative segregation for 22 months "without humane conditions of confinement or adequate medical care, and without periodic review of his confinement, causing his physical and mental deterioration." *Slevin*, 934 F. Supp. 2d at 1273 (citation omitted). A jury awarded him $15.5

18

million in compensatory damages, "to include $500,000 for each month that [the plaintiff] was incarcerated, plus an additional $1 million for each year since [the plaintiff's] release from custody." *Id.* (alterations added; citation omitted).

On review, the court denied remittitur, rejecting the defendants' argument "that $15 million is an unreasonably high award for non-economic, non-medical losses." *Id.* at 1274. The court emphasized "that deference to the jury's determination is most appropriate" in situations "where the jury has been asked to place a monetary value on [the plaintiff's] experience of non-economic harm[.]" *Id.* (alterations added; citation omitted).[8] Ultimately, the court concluded the jury's award was not excessive, pointing to the plaintiff's "physical, emotional, and mental suffering[,]" which included severe medical mistreatment, "six months alone in his cell with virtually no human contact[,]" and "'massively severe' PTSD" that affected his competence to stand trial. *Id.* at 1277 (alterations added).

*Smith.* In addition to the cases identified by the parties, the Court located two additional cases. In *Smith v. City of Oakland*, a plaintiff was wrongfully incarcerated for four-and-a-half months after law enforcement planted a weapon in his home. *See* 538 F. Supp. 2d 1217, 1221–23 (N.D. Cal. 2008). A jury awarded him $5 million for emotional distress. *See id.* at 1240. The court acknowledged that "a significant emotional distress award" was justified, noting the traumatic circumstances of the arrest and the ongoing impact of his time in confinement. *See id.* at 1240–41. Nonetheless, the court concluded the facts "d[id] not warrant" the $5 million verdict and proposed remittitur to $3 million. *Id.* at 1243 (alteration added).

---

[8] The court also identified a "significant distinction" between cases involving remittitur of jury awards and district court calculations of compensatory damages. *Slevin*, 934 F. Supp. 2d at 1276. The court noted that, "[w]hile a court has the benefit of legal precedent in fashioning what it finds to be a fair damages award, a jury is afforded no such comparative information, or any other guideposts, in valuing a plaintiff's losses." *Id.* (alteration added).

*Young.* Finally, in *Young v. Mayer*, an incarcerated person was baselessly placed in disciplinary separation for 60 days. *See* No. 20-cv-1136, 2023 WL 8367923, at *1 (E.D. Wis. Nov. 27, 2023). A jury awarded him $500,000 in compensatory damages, plus $200,000 in punitive damages. *See id.* In reviewing the award, the court noted that the plaintiff had testified to "a ripple effect of mental health challenges due to the imposition of required strip searches, handcuffs, and removal of any community integration privileges." *Id.* at *17. The court considered these statements "sufficient to describe his emotional distress and reputational humiliation[.]" *Id.* (alteration added); *see also id.* at *34 (noting that "there is sufficient evidence to conclude that [] severe punishments were inflicted . . . without justification, and that [the plaintiff] still feels those ramifications today" (alterations added)). Taking the evidence of the emotional effects and reputational harm together, the court concluded "the damages [we]re [] rationally related to evidence of the fact and conditions of [the plaintiff's] time in disciplinary separation." *Id.* at *34 (alterations added).

The court recognized that similar verdicts were "traditionally [] lower than the verdict in th[at] case." *Id.* at *33 (alterations added; citing cases awarding $250,000 to $350,000). It also described, however, "much higher" verdicts when the incarceration was wrongful. *Id.* at *34. The court then emphasized that, "although [the plaintiff in *Young*] was not unlawfully incarcerated, his emotional distress and reputational damages stemmed from an interference with his liberty, and a higher award may be supported by that fact alone." *Id.* (alterations added). In the end, considering both "the circumstances of [the plaintiff's] unjustified time in disciplinary separation, as well as the lasting effects of his emotional distress and damage to his reputation[,]" the court concluded that, "while it certainly approache[d] the outer limits of an appropriate award, the jury's verdict [wa]s not excessive." *Id.* (alterations added).

20

*Plaintiff's case.* This case includes many of the elements covered by the awards in *Kinge*, *Slevin*, *Smith*, and *Young*: among them, a traumatic arrest, strip searches, wrongful incarceration that included solitary confinement, continued uncertainty, and potential reputational harm. But this still leaves the Court considerable discretion, given that the awards in those four cases ranged from $250,000 (for an individual who was falsely incarcerated for two-and-a-half years but who did not suffer damage to reputation) to $500,000 (for an individual who was not wrongfully incarcerated but suffered from emotional distress, reputational damages, and interference with his liberty) to $3 million (for an individual who was wrongfully incarcerated for four-and-a-half months) to $15 million (for an individual who spent two years in nearly total solitary confinement, resulting in severe injury).

Here, Plaintiff has suffered considerably due to the Government's prosecution of him without probable cause. He spent nearly a year in solitary confinement and continues to suffer the effects of that experience. Most assuredly, he lives with the awareness that the Government maliciously prosecuted him. Yet, unlike in *Kinge* and *Smith*, Plaintiff's emotional distress is not rooted in the awareness that law enforcement deliberately planted or fabricated evidence against him. Further, unlike in *Slevin*, Plaintiff's solitary confinement — while difficult — was at least partially ameliorated by time spent outside the SHU — at the SCIF, in the law library, and visiting with family and legal counsel.

Considering these cases and the whole of admissible evidence presented at trial, the Court is persuaded that Plaintiff is entitled to six million dollars ($6,000,000) in non-economic damages.

In sum, the Court concludes Plaintiff is entitled to $6,279,508.00 in damages.

CASE NO. 13-24366-CIV-ALTONAGA/Reid

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1.  Plaintiff, Irfan Khan, is awarded $6,279.508.00 in damages.

2.  On or by **September 27, 2024**, the parties shall submit to the Court a calculation of interest associated with the damages award, at which point final judgment shall issue.

**DONE AND ORDERED** in Miami, Florida, this 20th day of September, 2024.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record